**WHITE AND WHITE, INC., et al., Plaintiffs-Appellees,**

v.

**AMERICAN HOSPITAL SUPPLY CORP., Defendant-Appellant.**

**No. 82–1305.**

United States Court of Appeals, Sixth Circuit.

Argued May 3, 1983.

Decided Dec. 16, 1983.

Rehearing and Rehearing En Banc Denied Feb. 7, 1984.

---

W. Donald McSweeney, argued, Schiff, Hardin & Waite, Chicago, Ill., for defendant-appellant.

Lawrence G. Meyer, argued, Patton, Boggs & Blow, Washington, D.C., Garret G. Rasmussen, Robert D. Vanderlaan, Mohney, Goodrich & Titta, Grand Rapids, Mich., for plaintiffs-appellees.

Before MERRITT and KRUPANSKY, Circuit Judges, and HORTON, District Judge.*

KRUPANSKY, Circuit Judge.

This is an appeal by American Hospital Supply Corp. (AHSC), a national distributor of hospital supplies, from a district court decision which held that AHSC violated Sections 1 and 2 of the Sherman Act by entering into a purchasing agreement with a group of hospitals that offered the hospitals volume discounts and a price increase limit in return for a high volume of purchases by the group from AHSC's full range of hospital supply products. The suit was initiated by White and White, Inc. and other local distributors of surgical supplies who compete with AHSC in various individual cities.

The record in this case is voluminous. The trial consumed 80 trial days, required 43 witnesses, produced 800 exhibits and generated almost 15,000 pages of transcript. The district judge issued an opinion that covers 95 pages in the official reporter. 540 F.Supp. 951–1046 (W.D.Mich.1982). On appeal, the joint appendix extends through 11 printed volumes of 4935 pages. Nonetheless, despite this prodigious compilation, the essence of the matter is not factually complex.

In 1977, 29 major non-profit hospitals located in 22 states created the Voluntary Hospitals of America (VHA), an incorporated for-profit organization, to provide each individual hospital with management services, research and development, economies of scale in purchasing, and a political presence. The common purpose of the above objectives was to contain hospital costs, then rising by 17.3% per year, and to discourage or forestall federal or state regulators from imposing mandatory controls on hospital charges. The same impetus to contain costs has been responsible for the creation of 200 other hospital purchasing groups generally organized (1) regionally, (2) by common religious affiliation or (3) in proprietary chains, such as Humana, or Hospital Corp. of America. VHA is unique only in that it is based on the common status of the members as major non-profit hospitals and not upon the more common bonds cited hereinabove.

These recent affiliations by hospitals have altered the hospital supply distribution business. Historically, individual hospitals relied upon local distributors to supply their medical and surgical requirements from local warehouses. As purchasing affiliations were evolved, local suppliers could no longer serve the individual affiliates which were located beyond the local distribution area. Consequently, some manufacturers of frequently consumed supplies began to distribute directly, and nationwide vendor groups were formed. AHSC is the largest of only two national vendors and it offers a complete range of supplies distributed from regional warehouses.

In 1979, AHSC executed an agreement with VHA which is the focus of this suit. Unlike traditional group purchasing agreements which involve the purchase of a given amount of product for a stated group-discounted price, the present agreement permits an individual VHA hospital to negotiate the terms of its own purchases, if any, from AHSC. If, at the end of the year, the aggregate volume of all merchandise sold by AHSC to any and all VHA hospitals reaches a given level, a retroactive rebate is paid by AHSC. This rebate is activated when aggregated purchases by VHA hospitals total $2,000 of supplies per

* Hon. Odell Horton, United States District Judge for the Western District of Tennessee, sitting by designation.

bed. At higher levels of sales per bed the 1% rebate is progressively escalated to a maximum of 6%. In 1979, VHA totaled 20,051 beds, requiring a total purchase from AHSC of $41,002,000 before the rebates became payable.

To implement this agreement, VHA and AHSC representatives visited each hospital to convince administrators that future rebates would offset any current price disadvantages. Moreover, VHA and AHSC officials planned to utilize "peer pressure" whereby hospitals purchasing in large volume from AHSC would induce the other VHA hospitals to assist in achieving the combined quotas. AHSC salesmen, in turn, were told to be "competitive" on price but to stress the greater benefits to be derived in the form of future discounts when the purchasing quotas were satisfied.

The district court initially concluded that the relevant product market was medical/surgical supplies, rather than all hospital supplies, and the relevant geographic markets were identified as each individual city wherein specific plaintiffs competed with the defendant. The court thereupon dismissed claims of exclusive dealing, group boycott, price fixing, illegal tying, and price discrimination.[1] It determined, however, that the agreement was an attempt to monopolize and a conspiracy to illegally restrain trade under a "rule of reason" analysis, which focused on the difficulties of single item regional suppliers in competing with a full product-line national distributor.

The specific sections of the trial court's opinion concerning each issue here appealed, and a more amplified factual accounting, will be more fully related at each respective section of the substantive discussion. It should be stressed in this factual overview that the principal issue of this case is the anticompetitive effect, if any, of the agreement, and the essence of the lower court's decision is a belief that AHSC impermissibly used the "lure" of future rebates, which were computed on sales of *all* types of hospital supplies, to eliminate price competition in medical/surgical supplies.

1. These rulings were not contested on appeal.

The district judge devoted fully 20 published pages to market analysis, and the parties correspondingly consign lengthy sections of the appellate briefs to the issue. Essentially, AHSC, a national distributor of all types of hospital supplies, objects to the finding that the relevant geographic markets are the individual cities wherein each plaintiff operates, and the product market is the medical/surgical supply segment of the total hospital supply business. The appellants here vigorously contest the findings below in three areas: 1) the applicable standard of review to market determinations; 2) the propriety of the "submarket" analysis in the present case; 3) the actual findings.

Standard of Review

The propriety of reviewing a determination of the relevant market as a factual or legal conclusion is not clearly or uniformly resolved in the case law. However, the preponderance of authority holds that the determination of a relevant market is composed of the articulation of a *legal* test which is then applied to the *factual* circumstances of each case. *See Borough of Lansdale v. Philadelphia Elec. Co.,* 692 F.2d 307 (3d Cir.1982); *Associated Radio Services Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981); *Telex Corp. v. I.B.M. Corp.,* 510 F.2d 894 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *Acme Precision Products, Inc. v. American Alloys Corp.,* 484 F.2d 1237 (8th Cir.1973); *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449 (9th Cir.1966), *rev'd. on other grounds,* 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1968). *See also International Boxing Club v. United States,* 358 U.S. 242, 251, 79 S.Ct. 245, 250, 3 L.Ed.2d 270 ("[W]e cannot conclude the district court was 'clearly erroneous' in [defining the market]"); Von Kalinowski, *Antitrust Laws and Trade Regulation* (1982) § 8.02[2](b), note 42. *But cf. United States v. Household Finance Corp.,* 602 F.2d 1255 (7th Cir.

1979), cert. denied, 444 U.S. 1044, 100 S.Ct. 732, 62 L.Ed.2d 730 (1980). Accordingly, the district court's formulation of the market tests may be freely reviewed on appeal as a matter of law; the conclusion that the relevant markets herein are medical/surgical supplies sold within specific cities is a finding of fact and subject to the "clearly erroneous" rule. Fed.R.Civ.P. 52.

### Market Analysis

Appellant AHSC argues that the trial court erred initially by not defining the relevant product and geographic markets before proceeding to consider potential submarkets, and further erred by utilizing an improper legal definition of a submarket. This issue reflects the confusion arising from the comparatively recent use of "submarket analysis" by courts. As Von Kalinowski has observed:

> The concept of relevant submarkets *does not, however, seem to add a new test* in determining the relevant product market for purposes of Section 2. It merely *provides several new factors, in addition to* [the existing ones of] selling price, uses, and physical characteristics, which the court *may use* in determining interchangeability between different products.

*Antitrust Laws and Trade Regulation, supra* at § 8.02[2]. (Emphasis added). Stated differently, a submarket analysis incorporates, but does not replace, the standard market test. It merely adds new factors to that test so as to more precisely define the market affected by the defendant's actions. In *United States v. Dairymen, Inc.,* 660 F.2d 192, 195 (6th Cir.1981) this Court underscored the point that a submarket is a market, ascertained by traditional market analysis, which includes additional, not wholly different considerations.

The district court in the case at bar, however, interpreted *Dairymen* as permitting a fact-finder to *substitute* the submarket "test" for the market "test" if the market test produced "ambiguous" results. 540 F.Supp. at 980, 982. Specifically, the district judge stated:

> [T]he relevant product focus of this action can be defined only by [*either*] a market analysis using the reasonable interchangeability of product use standard * * * *or* by a submarket analysis * * *.

*Id.* at 982.

■ Neither *Dairymen* nor any other case holds that market and submarket analyses are substitute tests. In fact, *Dairymen* remanded the issue of defining a geographic *submarket* with directions to apply the standard first enunciated in *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) for defining a geographic *market.* 660 F.2d at 195. The district court in the matter at bar, therefore, fundamentally erred by construing the market test and the submarket criteria as independent, substitute standards, leaving to the discretion of the trial court the option to employ "either" one "or" the other when, in fact, the submarket criteria are to be used in conjunction with the basic test to more precisely define the relevant markets. Accordingly, this Court's analysis must now proceed to an articulation of the basic definitions of relevant geographic and product markets, together with identifying the additional submarket criteria.

### Product Market Test

■ The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service. *United States v. E.I. DuPont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (The "Cellophane Case"). This comparative analysis has been characterized as the "reasonable interchangeability" standard. The *DuPont* Court noted that reasonable interchangeability may be gauged by (1) the product uses, *i.e.,* whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service. *See*

*also United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

### Geographic Market Test

■ The central rubric in evaluating the relevant geographic market was stated in *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) as follows:

> [T]he area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.

*Id.* at 327, 81 S.Ct. at 627.

### Submarket Criteria

Both of the standard market tests may be utilized in conjunction with the submarket criteria promulgated in *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962):

> A submarket may be determined by examining such practical indicia as (1) industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors.

*Id.* at 325, 82 S.Ct. at 1523.

Two examples illustrate the manner by which submarket criteria are to be utilized as an adjunct to the standard product and geographic market analyses. In *Brown Shoe,* the Court was confronted with a proposed merger between Brown Shoe and the Kinney Co., a shoe manufacturer and retailer. Brown was the nation's third largest shoe retailer; Kinney, the eighth largest. The government instituted suit to prevent the merger because the combination of Brown and Kinney would create a monopoly in the "footwear" product market. The District Court, recognizing industry practice and public perception, found separate footwear markets, later characterized as submarkets, of "men's," "women's," and "children's" shoes.

In *International Boxing Club of New York v. United States,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), the government initiated legal action to invalidate an agreement purporting to regulate the frequency and television exposure of boxing matches sanctioned by organizations in Illinois and New York. The defendants challenged the finding that the relevant product market was *championship* boxing rather than *all* professional boxing competition arguing that the product or service was identical. Although this case was decided prior to the articulation of formal "submarket criteria," the Supreme Court affirmed the narrower product market as supported by evidence of far greater interest in championship boxing by the public and broadcasters. Significantly, this additional evidence of public perception and consumer response, now part of the submarket criteria, was found to demonstrate that nonchampionship fights were not "reasonably interchangeable" with championship fights, which is the basic inquiry of the standard product market test.

### The Present Product Market

As previously noted, a product market is therefore defined by "reasonable interchangeability" as gauged by the interchangeability of other products for the same use, and by consumer sensitivity and response to price fluctuations among available substitutes. The district court herein explicitly rejected this basic test because it concluded the general purpose of all hospital supplies "is their use in the course of patient care." 540 F.Supp. at 983. The court thereupon found, solely by submarket analysis, (1) that the industry recognized a separate medical/surgical supply market as against markets for other products such as laboratory supplies; (2) that there were specialized vendors for medical/surgical supplies; (3) that there were distinctive marketing parties; and (4) that special groups within a hospital used medical/surgical supplies. *Id.* at 984.

■ The similarity of this case to *Brown Shoe,* where submarkets for men's, wom-

en's, and children's shoes were found within the broader product market of footwear, is striking. *Brown Shoe* is distinguishable in that it utilized the submarket indicia to more precisely answer the standard "reasonable interchangeability" inquiry, whereas the trial judge in the case at bar believed that the basic test and the submarket indicia were not related. However, while it is necessary on review to articulate the proper formulation of "market" and "submarket" concepts, it is plain that the factual conclusion reached below, that medical/surgical supplies constitute a relevant product market, is not clearly erroneous.

The parties, including defendant AHSC, do not take issue with the trial court's conclusion that medical/surgical supplies constitute a separate product market, insofar as that conclusion is an implicit finding, pursuant to the *DuPont* standard, that these items are not "similar in use" to, or "reasonably interchangeable" with, other hospital supplies. However, AHSC argues that while medical/surgical supplies are not, in themselves, similar to laboratory items or to parenteral supplies (intravenous fluids), the product market in the instant matter is the *distribution* of these medical/surgical supplies (a mixed product/service market), and there is potentially a high cross-elasticity between *distributors* of these specific supplies and *direct sales* of the same merchandise by manufacturers. Stated differently, there is a pricing level at which hospitals would abandon purchasing practices designed to maintain low inventory levels through frequent limited quantity purchases from local distributors in favor of volume purchases directly from the manufacturer. If only a very small price differential would induce distribution by manufacturers, then high cross-elasticity becomes apparent, and it would follow that manufacturers and distributors become substitute providers of medical/surgical supplies; *i.e.*, they are "reasonably interchangeable" and manufacturers must be included within the relevant product/service market.

The district court analyzed this argument by noting four barriers to high cross-elasticity: (1) manufacturers cannot offer emergency service; (2) manufacturers do not provide frequent, personal sales contact; (3) manufacturers must ship in bulk; (4) manufacturers offer only their own products. 540 F.Supp. at 987. The district judge thus implicitly concluded that no significant cross-elasticity existed.

On review, the Court must initially note that, notwithstanding the current barriers to market participation by manufacturers identified in the trial court's opinion, there is a paucity of evidence in the record as to how fluctuation in the price of medical/surgical supplies attributable to the method of distribution could alter present hospital purchasing practices, and thus this tribunal can neither affirm nor reverse the decision to exclude direct sales by manufacturers from the relevant product market. However, in view of our conclusion that the district court erred on other issues, it is not necessary to remand the issue of cross-elasticity for additional findings.

The Present Geographic Market

◼ The essential dispute concerning geographic market definition is the district court's description of the relevant geographic markets as the eight Standard Metropolitan Statistical Areas (SMSAs) wherein a VHA hospital is located and where AHSC and at least one plaintiff compete. 540 F.Supp. at 989. This Court notes that, as with the preceding product market analysis, there is imprecision in the utilization of the "market" and "submarket" concepts. Specifically, the court below *rejected* the eight SMSAs as "too small to reflect entire geographic markets" but then *approved* the SMSAs as "adequately defin[ing] geographic submarkets for this action." *Id.* at 992.

The fundamental error of the district judge in delineating the geographic market, as with his product market definition, was the mistaken premise that standard market tests may be abandoned or ignored and replaced with a less demanding "submarket test." Von Kalinowski, in his standard treatise which was frequently cited in the opinion below, clearly refutes the lower court's supposition:

This concept, that a relevant submarket may constitute the geographic market for Section 2 purposes, *does not, however, mean that a new test has been promulgated for determining the relevant geographic market.* It merely emphasizes the general rule that although the geographic market in some instances may encompass the entire nation, under other circumstances it may be a much smaller area, *i.e.,* a relevant submarket.

*Antitrust Laws and Trade Regulation, supra,* § 8.01[2] at 8–27 (footnotes omitted, emphasis added).

█ Accordingly, the proper criteria for defining a geographic market is that "area in which the seller operates, and to which the purchaser can practicably turn for supply." *Tampa Elec. Co., supra,* 365 U.S. at 327, 81 S.Ct. at 627. While that area is not ordinarily susceptible to a "metes and bounds definition," it is the area in which "producers effectively compete." *Id.* Accord, *United States v. Dairymen,* 660 F.2d at 195 (6th Cir.1981):

> On remand the district court should determine the relevant geographic submarkets on the basis of commercially significant areas in which D.I. operated and in which D.I.'s customers could turn to other suppliers. *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 [81 S.Ct. 623, 627, 5 L.Ed.2d 580] (1961).

In light of the clear mandate of this Court in *Dairymen* to define a geographic submarket in terms of the *Tampa Elec.* teachings for determining a geographic market, a mandate wholly consistent with accepted market theory, the district court's own findings condemn its conclusion:

> Assuming a firm is a representative supplier in the industry, the geographic market may be defined as that area where the seller predominantly operates. Some scholars suggest that an area should encompass a minimum of 75% of a supplier's sales before designating that area as a geographic market. *See Elzinga and Hogarty, supra.*

Plaintiffs appear to be representative suppliers in this industry. The following table abstracted from PX244, Table 1, indicates the geographic locus of at least 75% of the sales made from each of plaintiffs' six warehouses.

TABLE 2

| Supplier | Warehouse Location | Radius From Warehouse (Miles) | Percent of Hospital Sales |
|---|---|---|---|
| White & White | Grand Rapids | 0–75 | 80% |
| | Ann Arbor | 0–50 | 85% |
| Crocker-Fels | Cincinnati | 0–160 | 84% |
| Ransdell | Louisville | 0–65 | 77% |
| Skyland | Bluefield | 0–100 | 76% |
| | Ripley | 0–50 | 79% |

An immediate conclusion which can be drawn from the above data is that a 75% sales volume area may represent geographic regions of varying sizes. A 75% sales zone may be as small as a 50-mile radius from White and White's Ann Arbor warehouse, or as large as a 150-mile radius from Crocker-Fels' Cincinnati warehouse. No factor has been brought to the court's attention which accounts for this significant geographic disparity.

This disparity demonstrates the impossibility of defining the relevant geographic market for this industry as an area within a uniform radius around a city containing medical-surgical suppliers. Witnesses for several plaintiffs stated that the geographic extent of their business is a 75-mile radius from each warehouse location. It is clear that these estimates are accurate only with respect to individual warehouse sales areas and cannot represent the sales area of the average medical-surgical supplier.

Not only does the 75% sales area vary with each metropolitan location, most of these sales areas are geographically much larger than the parallel SMSA. This is seen from the following table which compares the size of the 75% sales area noted above to the local SMSA.

TABLE 3

| Supplier and Warehouse Location | Relevant SMSA | Maximum Diameter of SMSA (Miles) (PX 244, Table 2, Col. 4) | Diameter of Sale Area Miles Accounting for 75% of Warehouse Sales (PX 244) |
|---|---|---|---|
| White & White, Grand Rapids | Grand Rapids | 57 | 150 |
| White & White, Ann Arbor | Detroit | 100 | 100 |
| Crocker-Fels, Cincinnati | Cincinnati | 71 | 320 |

| CA 6234-2 Supplier and Warehouse Location | Relevant SMSA | Maximum Diameter of SMSA (Miles) (PX 244, Table 2, Col. 4) | Diameter of Sale Area Miles Accounting for 75% of Warehouse Sales (PX 244) |
|---|---|---|---|
| Skyland, Ripley, West Virginia | Charleston, West Virginia | 57 | 100 |
| Ransdell, Louisville | Louisville | 59 | 130 |

*In all cases, except Detroit, the SMSA in which a warehouse is located is considerably smaller than the sales area which accounts for at least 75% of that warehouse's sales.* This comparison makes it clear that the sales within the individual SMSAs account for considerably less than 75% of each warehouse sales. This is verified by the following table which reflects the percentage of shipments made from each plaintiff's warehouse to five selected SMSAs where a VHA hospital is located. (Source: PX244, Fn. 37)

**TABLE 4**

| Supplier and Warehouse Location | Relevant SMSA | % of Shipments Made From Warehouse Into the SMSA |
|---|---|---|
| White & White, Grand Rapids | Grand Rapids | 35% |
| White & White, Ann Arbor | Detroit | 41% |
| Crocker-Fels, Cincinnati | Cincinnati | 22% |
| Skyland, Ripley, W. Va. | Charleston | 54% |
| Ransdell, Louisville | Louisville | 46% |

*In my judgment, these sales' percentages are too low to find that each SMSA constitutes a separate geographic market.* A substantial portion of the seller's operation is beyond its home SMSA. Nevertheless, it appears that these SMSAs constitute individual geographic submarkets.

540 F.Supp. at 992–93 (emphasis added)

As the district court itself concluded, the evidence of actual sales by the plaintiffs did not support a finding "that each SMSA constitutes a separate geographic market," *id.,* because obviously the plaintiffs were effectively providing buyers with a significant amount of supplies (over half of total sales) well beyond each plaintiff's home SMSA. Plainly, the area of effective competition is much larger. The decision by the district court to openly abandon the fundamental measure of a geographic market was erroneous.

Market Definition—Conclusion

In sum, it must be emphasized that submarket criteria are merely additional considerations which permit a more precise formulation of relevant markets according to the basic standards for defining those markets. Although the trial court's exhaustive fact-finding ultimately permits orthodox market analysis, the analysis employed below suggests that the task of defining the relevant markets may be abandoned in favor of a less demanding determination of submarkets; the result of such an analysis would be to sever market definition from its root and breed a multitude of confusing hybrids. The final object of all market analysis is the identification of the relevant market; submarket criteria bring the most relevant market into sharper focus. In the matter at bar, insufficient evidence as to cross-elasticity here precludes this Court from reviewing the finding that the relevant product market is the wholesale distribution of medical/surgical supplies to hospitals. We reverse, as clearly erroneous, the finding defining the relevant geographic market.

Unreasonable Restraint of Trade—Sherman 1

■ Perhaps the most critical issue here on appeal is the issue of unreasonable restraint of trade. It is yet another issue that the district court misperceived in the most fundamental manner.

The essential elements of a violation of Section 1 of the Sherman Act are:
1) a contract, combination or conspiracy;
2) affecting interstate commerce;
3) which imposes an "unreasonable" restraint of trade.

*Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 827 (6th Cir.1982); *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1195–96 (6th Cir.1982). *See also Affiliated Capital Corp. v. City of Houston,* 700 F.2d 226, 235 (5th Cir.1983). Judicial experience with some forms of restraint has produced a recognition that certain types of conduct are *per se* unreasonable and a violation of Section 1. *Von Kalinowski, supra,*

§ 6.02[3] at 6–93. However, other restraints are to be fully analyzed under the "Rule of Reason." In *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 2472–73, 73 L.Ed.2d 48 (1982), the Supreme Court recently described the limitations of such an inquiry:

Section I of the Sherman Act of 1890 literally prohibits every agreement "in restraint of trade." In *United States v. Joint Traffic Assn.,* 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898), we recognized that Congress could not have intended a literal interpretation of the word "every"; since *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), we have analyzed most restraints under the so-called "rule of reason." As its name suggests, the rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition.

The elaborate inquiry into the reasonableness of a challenged business practice entails significant costs. Litigation of the effect or purpose of a practice often is extensive and complex. *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Judges often lack the expert understanding of industrial market structures and behavior to determine with any confidence a practice's effect on competition. *United States v. Topco Associates, Inc.,* 405 U.S. 596, 609–610, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972). And the result of the process in any given case may provide little certainty or guidance about the legality of a practice in another context. *Id* at 609, n. 10, 92 S.Ct. at 1134, n. 10; *Northern Pac. R. Co. v. United States, supra,* 356 U.S., at 5, 78 S.Ct., at 518. (Footnote omitted).

The essence of the Section 1 Rule of Reason analysis "is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). This query must be resolved by distinguishing between conduct that injures *competition* and that which may injure *competitors.* This Court has forthrightly stated:

Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor. Lively legal competition will result in the efficient and shrewd businessman routing the inefficient and imprudent from the field. The antitrust laws must be administered in such a way that they do not restrain such vigorous competition in order to protect inefficient competitors. As Judge Learned Hand has pointed out, "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Company of America,* 148 F.2d 416, 430 (2d Cir.1945). Merely to attempt to succeed in business is not anticompetitive conduct.

*Richter Concrete Corp., supra,* 691 F.2d at 823.

The district court identified the anticompetitive feature of AHSC's contract with VHA as a (1) linkage of unrelated products which (2) creates a leverage effect that (3) thwarts price competition for medical/surgical supplies. 540 F.Supp. at 1002. Simply put, the alleged evil is that AHSC used the rebate on the sale of all goods to induce, or "leverage," the hospitals to buy more items from AHSC than they would have bought under strict price competition by item.

The fallacy of the district court's logic can be highlighted by comparing the present case with the principal case authority on anticompetitive leveraging. In *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978), Lilly was the monopoly producer, by patent, of Keflex and Keflin, two types of cephalosporin which together accounted for 75% of all cephalosporin sales. A third type of cephalosporin, developed in Japan, was manufactured by license under the Lilly trade name of Kefzol, and by a competitor,

SmithKline, under the name Ancef. As the patent holder and monopolist for Keflex and Keflin, Lilly made "far higher" profits on those drugs than it did on Kefzol, which competed with Ancef. *Id.* at 1061. Accordingly, Lilly devised a rebate plan whereby hospitals could achieve a 3% total rebate if their combined purchases of all three Lilly cephalosporins reached a certain level. *Id.* at 1060.

The Third Circuit ruled that the Lilly plan was anticompetitive because Lilly had utilized its *monopoly* on Keflex and Keflin to leverage sales of Kefzol in a *competitive* market. Hospitals which (1) required. Keflex and Keflin, and (2) had to buy it from Lilly were, as a practical matter, (3) forced to select Kefzol (Lilly) over Ancef (SmithKline) because they were already heavily, though unwittingly, involved in the rebate plan.

The key to the "leverage" analysis, as developed in *Lilly,* therefore, is the use of monopoly power in one area to amplify, or "leverage," a position in another, competitive, market. It is thus analogous to a "tying" arrangement where a seller with monopoly power in one product (the tying product) uses that power to force a buyer to accept a second (tied) product under anticompetitive conditions. The only difference between "tying" and "leveraging" is that a tie-in requires proof that the second (or tied) item is forced upon the buyer as a "condition" of the original sale, whereas leverage does not involve such an overt, coercive link. *See Northern Pacific Ry. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Otherwise, both "tying" and "leveraging" constitute the use of (1) monopoly power in one market to (2) restrain competition in a second market.

*SmithKline* is distinguishable from the case at bar in that AHSC has not been shown to possess any monopoly power prior to the agreement with VHA such that it could leverage that dominant power in one area of hospital supplies to restrain competition in medical/surgical supplies. Without proof of requisite monopoly power, AHSC is simply an integrated company, facing across the board competition in every area of hospital supplies it sells from vendors in every product and geographic market. AHSC sought to challenge that competition by superior organization; that is, by acquiring national and all-inclusive product range capability. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 276 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Indeed the contract here at issue, which all agree does not compel the VHA member hospitals to purchase a single dollar of AHSC products, prompted one of the plaintiffs to create United Hospital Supply Co., a large full-range supply consortium. 540 F.Supp. at 1012. Moreover, as the district court itself noted, hospitals are rapidly affiliating into purchasing groups which are "a significant suppressant to *small-scale* competition". *Id.* at 1011 (emphasis added). This natural transition of demand, which was previously expressed by many small, independent hospitals but is presently emerging in larger purchasing cooperatives, would appear to stimulate new sales techniques and innovation by suppliers. If the rise in health costs and expanding government involvement and regulation are creating a national supply industry, the antitrust laws will not shelter the out-dated local suppliers any more than it could have prevented supermarkets and discount stores in regional shopping malls from satisfying the demands of mobile suburban buyers who no longer patronized family-operated corner grocery stores within walking distance of individual city neighborhoods.

In sum, the Court is constrained to conclude that the district court's "leverage" analysis is legally incorrect, and that its conclusion on the reasonableness of volume discounts is erroneous.

Attempt to Monopolize—Sherman 2

The offense of attempt to monopolize (Sherman Act § 2) is composed of the following elements:

1. Specific intent to monopolize;

2. Anti-competitive conduct;

3. A dangerous probability of success.

*Lorain Journal Co. v. United States,* 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951). *Accord, Richter Concrete Corp. v. Hilltop Concrete Corp., supra,* 691 F.2d at 823; *United States v. Dairymen, Inc., supra,* 660 F.2d at 194; *Northeastern Telephone Co. v. American Tel. & Tel.,* 651 F.2d 76, 85 (2d Cir.1981). Monopolization is the market power to control prices or exclude competition. *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). Specific intent to monopolize may be inferred from evidence of anticompetitive conduct, *Lorain Journal, supra,* but not from legitimate business practices aimed only at succeeding in competition. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953).

As previously noted, the defendant's conduct is not an unreasonable restraint of trade nor anticompetitive leveraging, in part, because AHSC has not been shown to possess monopoly power in one area which it could use as leverage in another. However, the "dangerous probability" component of a Section 2 violation is worthy of consideration in the instant case.

 The dangerous probability of success requires a finding that the defendant possessed "market strength that approaches monopoly power—the ability to control prices and exclude competition." *Richter Concrete Corp., supra,* 691 F.2d at 826. This test clearly mandates a comparison of the defendant's size, performance and policies to that of other competitors *and* an analysis of the market structure. Von Kalinowski, *supra* § 8.03[3] at 8–34–2. This key area of structural analysis is presented by Von Kalinowski in his authoritative treatise as follows:

(4) Past and probable development of the industry. Monopoly power is more likely to arise in an industry which is relatively static and which has not had, and is not likely to have, sudden changes in the style of its merchandise or in the volume of demand, than in an industry which is dynamic and constantly changing.

(5) Ease with which a new enterprise may enter the industry. The fact that it is difficult for a new firm to enter the industry, or that no new competitors have entered the market for a number of years, may be very important factors in determining that existence of monopoly power.

*Id.* (Footnotes omitted).

The "development of the industry" analysis is perhaps nowhere so important as in a "dynamic and constantly changing" business. An awareness that markets themselves are changing in size and product scope may allow a clear inference that a successful defendant is not seeking to monopolize the old, dying, smaller market (established by past sales), but is an emerging competitor in the new, developing, larger market. *See United States v. Columbia Steel Co.,* 334 U.S. 495, 528, 68 S.Ct. 1107, 1124, 92 L.Ed. 1533 (1948) ("The relative effect of percentage command of a market *varies with the setting in which that factor is placed*"). *Accord, Richter Concrete Corp., supra,* 691 F.2d at 826–27; *Broadway Delivery Corp. v. United Parcel Service,* 651 F.2d 122, 128 (2d Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981).

In the case at bar, the district court found that AHSC had the following market shares in the market defined by past sales and improperly restricted to SMSAs:

**TABLE 6**

| SMSA | Defendant's Market Share Percentage |
|---|---|
| Cincinnati | 30.32 |
| Columbus | 39.57 |
| Indianapolis | 27.02 |
| Louisville | 13.86 |
| Charleston | 45.81 |
| Grand Rapids | 18.04 |
| Detroit | 23.26 |
| Dayton | 28.67 |

\* \* \*

The serious anticompetitive character and objectives of defendant's conduct, the fragility of the defendant's competitors, and defendant's ever increasing dominance in the relevant metropolitan submarkets, leads the court to conclude that

where defendant's metropolitan market share exceeds 25%, the defendant's anti-competitive conduct is performed with the requisite dangerous probability of success to establish an attempt to monopolize violation. In the following five SMSAs, the plaintiffs have satisfied the dangerous probability of success requirements: Charleston, Cincinnati, Columbus, Indianapolis and Dayton. In the remaining three SMSAs, Detroit, Grand Rapids and Louisville, no dangerous probability is shown.

540 F.Supp. at 999, 1013.

■ Given the significant changes emerging in the hospital supply industry, the district court's conclusion that any market share in the above-defined markets above 25% presents a "dangerous *probability*" of monopoly power is untenable. *See Richter Concrete Corp., supra,* 691 F.2d at 826 (30% share of market insufficient); *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 271 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) ("[N]umerous courts have found a market share of 30% or higher to be insufficient, by itself, to prove a dangerous probability of monopolization (citing cases)"). The district court itself touched upon, but then passed over, the critical finding of fact:

The restructuring of hospital demand through the formation of hospital purchasing groups is a salient factor in assessing the defendant's capacity to unlawfully attempt to monopolize the relevant metropolitan markets. It is important to note that if competitive, this consolidation is not a basis for finding any antitrust liability. Group purchasing may be highly competitive and its high volume buying may bring about substantial savings to the individual hospitals within the group.

An entire industry can undergo a natural transition from competition between many, smaller entities to competition between fewer, larger entities. In such a case, the larger firms which benefit from such a transition are not subject to antitrust liability. The Sherman Act preserves competition, not competitors, large or small. Consequently, if more medical-surgical business is consolidated into hospital purchasing groups, and such groups prefer to deal with a national vendor such as AHSC, then by the ebb and flow of competitive transactions, a national firm may flourish and local firms may die of attrition. If this evolution occurs through natural competition, the demise of small medical-surgical houses is not actionable under the antitrust laws.

\* \* \* \* \* \*

AHSC has traditionally enjoyed the vast majority of medical-surgical supply business with the larger proprietary hospital chains. Non-profit hospitals are increasingly entering into multi-regional purchasing groups. Many of these groups prefer a vendor capable of serving the wide geographic area embracing their membership. Consequently, AHSC's dominance in the medical-surgical distribution business is certain to increase as new, multi-regional groups form and transfer business to the defendant. Concomitantly, the strength of metropolitan and regional firms will decline as hospitals purchase under multi-regional instead of local contracts.

540 F.Supp. at 1012, 1013.

These changes in the hospital supply industry, so conclusively established by the record below, reflect the emergence of new, multi-regional markets, established by a profound reformation in the nature of the *consumer* of hospital supplies. There is scant evidence that AHSC created this new market; rather, there is abundant proof that expensive medical technologies, a progressively aging population, the strain on public and private payment plans, and competition from franchised for-profit hospital chains, forced non-profit hospitals to realize that they cannot continue business as usual, but must demand new, more cost-effective, products and services. One approach has been to purchase supplies in volume as a member of a group. AHSC, recognizing, as the district court also found, that local suppliers will decline as the market so reforms

itself, sought to prepare itself for the future. This Court cannot, like King Canute, employ the antitrust laws to hold back the tides that threaten these plaintiffs.

The decision below is reversed and the matter ordered remanded for entry of judgment in favor of the defendant.