**KERASOTES MICHIGAN THEATRES, INC., Plaintiff,**

v.

**NATIONAL AMUSEMENTS, INC., Northeast Theatre Corporation, Michael Redstone and Sumner Redstone, Defendants.**

**NATIONAL AMUSEMENTS, INC., Counter-Plaintiff,**

v.

**KERASOTES MICHIGAN THEATRES, INC., Counter-Defendant,**

and

**George G. Kerasotes, Anthony L. Kerasotes, Marjorie Kerasotes, Louis G. Kerasotes, John G. Kerasotes, Robert A. Kerasotes, Denis Kerasotes, Dan Stone, Kerasotes Indiana Theatres, Inc., Kerasotes Administration Company, Kerasotes Illinois Theatres, Inc., Kerasotes Missouri Theatres, Inc., Kerasotes Iowa Theatres, Inc., Louis G. Kerasotes Corporation and George G. Kerasotes Corporation, As Additional Defendants on the Counterclaim.**

No. 85–CV–40448–FL.

United States District Court,
E.D. Michigan, S.D.,
Flint Division.

May 1, 1987.

David A. Ettinger, Detroit, Mich., for plaintiff and counter-defendant.

Eugene Driker, Elaine Fieldman, Detroit, Mich., Barry Rabeck, Boston, Mass., Tad Jankowski, Deaham, Mass., for defendant and counter-plaintiff.

Janathan T. Watton, Jr., Detroit, Mich., for defendants.

Joseph V. Griffen, Chicago, Ill., for counter-defendant.

## MEMORANDUM OPINION AND ORDER

NEWBLATT, District Judge.

Before the Court is counterdefendants' Motion to Dismiss counterplaintiff's counterclaim pursuant to Rule 12(b)(6), Fed.R. Civ.P. In bringing a Rule 12 motion, the moving party has the burden of demonstrating that no claim has been stated. All factual allegations of the complaint must be assumed to be true, and all reasonable inferences are made in favor of the non-movant. *Miree v. Dekalb Co.*, 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). "After thus construing the complaint, the Court should deny a motion to dismiss for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" 2A Moore's *Federal Practice*, ¶ 12.07[2.–5] (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).[1]

The relevant facts follow: On September 25, 1985, Kerasotes Michigan Theatres, Inc., (KMT) filed a six-count complaint against National Amusements, Inc., (National) and others alleging that they were monopolizing and unreasonably restraining trade with respect to the exhibition of movies in the Flint, Michigan area.[2] On November 22, 1985, National filed a counterclaim alleging that KMT and others,[3] engaged in conduct which violated antitrust laws.[4]

In late 1984, KMT purchased four theatres in the Flint area from Butterfield Theatres. KMT, which previously did not operate in the Flint area, now operates or has a total of eleven indoor screens for the exhibition of films. National owns and operates two indoor theaters in the Flint area with a total of ten screens. National claims that prior to filing suit KMT attempted to induce National to enter into a "split" or an agreed-upon allocation of films in this area between National and KMT. When National refused, National claims that KMT began this lawsuit as well

---

1. When a federal court reviews the sufficiency of a complaint, before the reception of any evidence ... its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.
   *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

2. Specifically, KMT alleges that defendants monopolized and attempted to monopolize the exhibition of films in the Genesee County area in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and that agreements between defendants and film distributors constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. KMT also alleges that

defendants' actions violate state antitrust laws and constitute tortious interference with prospective business advantage.

3. All referred to as counterdefendants.

4. In addition to alleging that counterdefendants violated Sections 1 and 2 of the Sherman Act, National claims that counterdefendants have violated Section 7 of the Clayton Act, 15 U.S.C. § 18. Moreover, National alleges that counterdefendants' actions constitute a violation of Michigan Antitrust laws, that KMT's complaint in this action violates Sections 1 and 2 of the Sherman Act as well as being an abuse of process under Michigan law and that counterdefendants tortiously interfered with National's prospective business relations.

as other suits against movie distributors to induce and coerce them into licensing motion pictures to KMT. Moreover, National asserts that KMT used its market power outside Flint to induce and coerce distributors to license motion pictures to KMT and to discriminate against National in the Flint area.

## I

Counterdefendants (KMT) first claim that National lacks the antitrust injury necessary to assert its claims in markets in which it does not compete.[5] In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), the Supreme Court held that an antitrust plaintiff "must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[6] In *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983), the Court based its finding of the lack of antitrust injury, in part, on the fact that the antitrust plaintiff was "neither a consumer nor a competitor in the market in which trade was restrained," and thus were not persons injured by reason of the antitrust law violation.[7]

Counterdefendants contend that National has not plead an antitrust injury in markets other than Flint because it does not compete with counterdefendants in any market except Flint. This need not be reached because National has responded that it does not assert that it has been injured in markets in which it does not compete with counterdefendants. Instead, National claims that KMT used its market power outside Flint to restrain competition in the Flint area. Such leveraging has long been recognized as illegal and actionable. *See White & White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495 (6th Cir.1983).

Counterdefendants next claim that National's allegations under Sections 1 and 2 of the Sherman Act[8] fail to state a claim upon which relief can be granted because National has not and cannot plead an unreasonable anticompetitive effect on the Flint area market. Counterdefendants contend that National's Sherman Act claims allege a vertical agreement and that such vertical agreements are governed by the rule of reason which requires a showing of a significant anti-competitive effect. In response, National contends that it has alleged that KMT's actions constitute a *per se* violation and that even if the rule of reason is applied, it has stated a claim.

---

5. Private parties may bring actions for violation of antitrust laws under Section 4 of the Clayton Act, 15 U.S.C. § 15. One of the requirements before a private party may sue for money damages is that he has suffered an antitrust injury.

6. *See also Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1234 (6th Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 707 (1981).

7. *See also South Haven Land Co. Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (1983). In *South Haven*, the Sixth Circuit Court of Appeals examined the factors courts should use in analyzing whether an antitrust plaintiff had standing under section 4. Among these factors was the "nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market." *Id.* at 1084.

8. Three elements must be established to prove a violation of Section 1: (1) a contract, combination or conspiracy among two or more separate entities, (2) that unreasonably restrains trade,

and (3) is in or affects interstate commerce. See *White & White, supra.* To determine whether a restraint unreasonably restrains competition, there are two methods of analyses: the rule of reason and the *per se* rule.

In *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966), the United States Supreme Court stated that the elements of a Section 2 monopoly offense were:

(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

In *White & White*, the Court of Appeals stated the Section 2 attempt to monopolize is composed of the following elements:

(1) Specific intent to monopolize.
(2) Anti-competitive conduct.
(3) A dangerous probability of success.

*White & White* at 506.

## A

■ National contends that its allegations concerning a horizontal conspiracy to boycott against National constitutes a *per se* restraint of trade which is presumed to be unreasonably anticompetitive.[9] Although the rule of reason is generally applied in Sherman Act cases, the Supreme Court has indicated that certain acts "are conclusively presumed illegal without further examination under the rule of reason 'because they are plainly anticompetitive.'" *Com-Tel, supra* at 408. Group boycotts,[10] specifically those involving agreements between competitors at the same level (horizontal), are generally considered under the *per se* classification. *See Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190 (6th Cir.1982).

■ For a boycott to be analyzed under the *per se* rule, it must involve a group of competitors at the same level. In *Dunn & Davis v. NuCar Drive Away*, 691 F.2d 241 (6th Cir.1982), it was found that there was no invalid group boycott when the complaint did not assert that a group of competitors on the same level coerced, suggested or agreed with a manufacturer to terminate its relationship with plaintiffs. *See also Davis-Watkins, supra.*[11] In this case, National states that although the precise relationship among the counterdefendants is not entirely clear, the counterdefendants had the capacity to conspire.[12] However, the issue is whether they are competitors, and an examination of the counterclaim reveals that of the various counterdefendants, none are competitors of National except KMT. Thus, there is no conspiracy among competitors.

Moreover, National's argument that just because counterdefendants and distributors are in a vertical relationship with one another does not necessarily exempt them from *per se* liability must similarly be rejected. Although it is true that when manufacturers or suppliers succumb or agree to carry out the action against a party proposed by a customer-competitor of that party, the ultimate effect is a horizontal combination,[13] National has neither alleged that the distributors have agreed to such plans among themselves or with the counterdefendants nor claimed that there is a unity of purpose or common design among movie distributors. Finally, National contends that the type of leveraging alleged in this case where counterdefendants have used market power in closed towns to obtain preferential treatment in Flint, has been considered analogous to tying agreements which is a *per se* violation. Although it is true that these situations are analogous, the cases National cites still apply the rule of reason to leveraging cases.

## B

■ As National's complaint alleges a vertical agreement, National has the burden of establishing that the particular acts are unreasonable restraints of trade. *Continental T.V. v. GTE Sylvania*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688–690, 98 S.Ct. 1355, 1363–64, 55 L.Ed.2d 637

---

**9.** National cites *Com-tel, Inc. v. Dukane Corp.*, 669 F.2d 404 (6th Cir.1982), which involved three dealers of a manufacturer's product who conspired with a manufacturer whose policy was to permit intrabrand competition. The dealers agreed with the manufacturer that they would all refuse to deal with plaintiff, a price cutter. The Court found this conduct illegal as a group boycott.

**10.** Group boycotts are concerted refusals by traders to deal with other traders. *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

**11.** Although it is true, as National asserts, that the Court must inquire as to the effect and purpose of the restrictions in determining whether a defendant's actions are *per se* illegal; nevertheless, before the Court can consider this, it must decide whether there was in fact a horizontal agreement.

**12.** Although National contends that parties to a boycott do not need to be competitors, this ignores the facts of the cases it cites. Moreover, National cites *A.I. Root Company v. Computer Dynamics, Inc.*, 615 F.Supp. 727 (D.C.Ohio 1985), which actually supports the Court's conclusion that for the counterdefendants' action to be analyzed under the rule of reason requires collusion among *competitors*.

**13.** *See Com-Tel, supra* (quoting *Klors, supra; United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966)).

(1977), the Supreme Court stated that the basic inquiry under the rule of reason "is whether the restraint is one that promotes or suppresses competition," an inquiry which is "confined to a consideration of impact on competitive conditions."[14] The restraint must produce a significant anticompetitive impact to be found unreasonable. *Hand v. Central Transport, Inc.,* 779 F.2d 8 (6th Cir.1985). *See also Dunn & Mavis, supra.*[15]

In deciding whether there is a significant anticompetitive effect, courts require antitrust plaintiffs to establish that the defendant has significant market power. *Hand, supra* at 11; *See also Davis-Watkins, supra* at 1202 ("Without market power a firm cannot have an adverse effect on competition").

The Court agrees with counterdefendants that National has failed to allege facts establishing a significant impact on competition. Market share allegations frequently substitute for market power allegations. A review of the counterclaim, specifically paragraph 12, indicates that National's main complaint is for harm to itself, not harm to competition. Even giving the complaint the most liberal interpretation, it must be concluded that National has failed to allege facts to establish that there is a significant impact on competition or market shares from which market power can be inferred. There is nothing in the complaint which would indicate that there has been an effect on prices or output.

National's several arguments in support of its assertion that it has alleged significant anticompetitive effect must be rejected. First, National's contention that counterdefendants used monopoly power in closed towns to effect films it sought to show in the Flint area deals with the effects on National, not on competition. Next, National's statement that KMT has more indoor screens does not equal a restraint of trade nor does it establish market shares. Moreover, as to National's contention that counterdefendants made an effort to involve National in "a split" with the intent to unreasonably restrain trade, this was rejected and thus could not cause an anticompetitive effect.

National also contends that films have been awarded to KMT on a basis other than merit. It is hard to see how this, standing alone, results in an anticompetitive effect. It appears, however, that this relates to National's argument that counterdefendants have succeeded in unlawfully obtaining exclusive rights to exhibit films in the Flint area and that, at a submarket level, competition for patrons for particular films has been eliminated since KMT owns exclusive exhibition rights. Moreover, National claims the public is harmed by having to view pictures in theaters which are old and poorly maintained. The first part of this claim depends on whether individual films are distinct submarkets.[16] In *White & White, supra* at 500, the Sixth Circuit held that submarket criteria could be used in defining relevant markets but not as a substitute. Thus, this Court may be able to use submarket considerations in determining the market and in identifying anticompetitive impact. In this case, not only has National failed to allege that the individual films constitute distinct submarkets, but it has failed to specify how this lessens competition.

**14.** Antitrust laws are designed to protect competition, not competitors. *Brunswick, supra* at 488, 97 S.Ct. at 697. *See also Richter Concrete v. Hilltop Concrete,* 691 F.2d 818 (6th Cir.1982). "[T]he fact that the . . . practice adversely affects a firm's business is ordinarily insufficient to establish an unreasonable restraint of trade, absent further proof that such adverse effect also substantially impairs competition." ABA ANTITRUST SECTION, *ANTITRUST LAW DEVELOPMENTS* 18 (2d ed. 1984).

**15.** This is also a requirement in a Section 2 case. *Byars v. Bluff City News Co.,* 609 F.2d 843, 860 (6th Cir.1979).

As preservation of competition is at the heart of the Sherman and Clayton Acts, a practice should be deemed 'unfair or predatory' only if it is unreasonably anticompetitive. In a § 2 case, only a thorough analysis of each fact situation will reveal whether the monopolistic conduct is unreasonably anticompetitive and thus unlawful.

**16.** This is also important for determining market power. As counterdefendants point out, this is not contained in the counterclaim.

Moreover, the parties clearly agree that the relevant market is indoor movie theaters in the Genesee County area. As for the idea that the public is harmed by having to view pictures in old and badly maintained theaters as a factor to be considered in deciding whether competition has been harmed, no authority for this proposition can be found. Moreover, as the counterdefendants have responded, this would involve the Court in assessing public preferences,[17] something it appears totally inappropriate to do.

Thus, counterdefendants' motion must be granted as to National's claim under Sections 1 and 2 of the Sherman Act for monopolization and restraint of trade because National has failed to allege facts which would establish a significant anticompetitive effect.

## II

Counterdefendants also contend that National's Section 2 claim that counterdefendants have attempted to monopolize the exhibition of first-run motion pictures in the Flint area must be dismissed for failure to state a claim. An attempt to monopolize is composed of (1) the specific intent to monopolize, (2) anticompetitive conduct (3) and a dangerous probability of success. *White & White, supra* at 506. Counterdefendants contend that National has failed to satisfy this last element. The last element "requires a finding that the defendant possessed 'market strength that approaches monopoly power [in the relevant market]—the ability to control prices and exclude competition.' This test clearly

mandates a comparison of the defendant's size, performance and policies to that of other competitors and an analysis of the market structure." *Id.* at 507 (*quoting Richter*, supra). In *Richter, supra* at 826–27, the Sixth Circuit stated that although "[m]arket strength is often indicated by market share," the real test is whether the defendant "possessed sufficient market power to achieve its aims." In *Richter*, a 30% market share was not sufficient to establish a dangerous probability of success and other courts have found that amounts up to a 50% market share were not sufficient. *See Antitrust Law Developments, supra*, at 141–42, n. 205.

In this case, National has failed to allege that there is a dangerous probability of success—specifically, that KMT has a sufficient market share or power to achieve its aims. Nowhere in the counterclaim does National allege that counterdefendants possessed sufficient market power in the Flint area to obtain monopolistic control of that market. National states in its response that it has plead that counterdefendants have significant market strength by alleging that counterdefendants have engaged in conduct, "the effect of which results in their controlling prices and excluding competition on the merits in the licensing of motion pictures in the Genesee County area." The conclusory allegation is insufficient for it is market power allegations that are needed. Thus, counterdefendants' motion must be GRANTED.

---

**17.** National also mentions that the public has been harmed by having to pay higher prices but this allegation is nowhere to be found in the counterclaim. Moreover, National cites *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) and *NCAA v. Board of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) in support of its contention that the Court should assess consumer preferences. Although the Supreme Court in *NCAA* indicated that Congress designed the Sherman Act as a "consumer welfare prescription," (citing *Reiter* at 343, 99 S.Ct. at 2333), the Court analyzed restraints in terms of their effect on measurable factors such as price and output.

A restraint that has the effect of reducing the importance of consumer preference in setting price and output is not consistent with [the

fundamental goal of consumer welfare prescription] of antitrust law.
*NCAA* at 88.

As to the issue whether National has alleged facts sufficient to show that counterdefendants have sufficient market power, the Court is satisfied that National has satisfied its pleading obligation. National has alleged that the counterdefendants used monopoly or market power in other markets to restrain trade in this market. In this respect, this case is similar to *Hand, supra* which used a rule of reason analysis for a tying arrangement (analogous to the leveraging allegations in the instant case). The court stated that in deciding whether tying two products poses a threat of competitive harm requires that the seller have power in the tying product market. *See also White & White, supra* at 506.

## III

■ Counterdefendants next contend that National has failed to state a claim under Section 7 of the Clayton Act. Section 7 states in pertinent part:

That no person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of any stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce in any section of the country, *the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.*

15 U.S.C. § 18. (emphasis added.) As counterdefendants state, the only theory that National could assert alleging a violation of Section 7 is under the "potential competition doctrine," since the acquisitions were neither vertical nor horizontal. In fact, in National's responsive brief it appears that National is asserting the "potential competition theory." [18] However, National has neither plead this theory nor the facts establishing the elements for this theory. Thus, counterdefendants' motion must be GRANTED.

## IV

■ The counterdefendants also claim that National has not properly plead an abuse of process claim. "To recover under a theory of abuse of process, a plaintiff must plead and prove (1) an ulterior purpose and (2) an act in the use of process

which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc,* 412 Mich. 1, 30, 312 N.W.2d 585 (1981). In *Three Lakes Ass'n v. Whiting,* 75 Mich.App. 564, 255 N.W.2d 686 (1979), the Court attempted to define the nature of the improper act in the use of process that must be plead.

The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance of a formal use of the process itself, which constitutes the tort.

*Id.* at 573, 255 N.W.2d 686 (quoting Prosser, Torts (4th Ed.), § 121, p. 857.

If the process is employed from a bad or ulterior motive, the gist of the wrong is to be found in the uses to which the party procuring the process attempts to put it ... [T]he moment [the party procuring the process] attempts to attain some collateral objective, outside the scope of the operation of the process employed, a tort has been consummated.

*Id.* (*quoting* Harper & James, *The Law of Torts,* vol 1, § 4.9, p. 331).

Thus, simply filing a complaint with improper or ulterior purpose is not sufficient. Rather, a plaintiff must also plead that the party procuring the action has attempted to put that action to an improper use. In this case, National contends that counterdefendants have threatened and brought litiga-

---

**18.** National states that "[t]he counterdefendants had the capacity to enter the market, in which they bought the Butterfield theatres, *de novo.* They chose instead to acquire the theatres and thereby remove themselves as potential competitors."

As counterdefendants point out the potential competition theory has been used to analyze acquisitions for their possible violation of Section 7 and involves acquisition of firms in the relevant market by firms outside the relevant market. *See e.g., United States v. Marine Bancorporation,* 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

Transactions eliminating a potential competitor have been challenged because ... the ac-

quiring firm, *but for the merger,* very likely would have entered a concentrated market *de novo* or by acquisition of a much smaller ('toehold') firm, thus creating additional competition and likely future deconcentration in the market ... *Antitrust Law Developments, supra,* at 178.

The principal prerequisite to this theory is that the market be sufficiently concentrated. *United States v. Marine Bancorporation, supra.* Moreover, it must be determined that the entering company had feasible means of entry other than by acquisition and that 'those means offer a substantial likelihood of ultimately significant procompetitive effects.' *Id.* at 633 [94 S.Ct. at 2875].

tion against National "to induce counter-plaintiff into diminishing its competition with counterdefendant ..." [Counterclaim at § 16]. National further states in its brief that:

> [c]ertain counterdefendants sought to 'split' motion picture product in Genesee County and when National refused, this lawsuit was brought. Thus, the purpose of the suit was not to eliminate National's allegedly anticompetitive conduct, but to get National to play ball with them.

Although it is clear that National has plead an ulterior motive, it has failed to allege that counterdefendants, other than filing the instant case, have attempted to put the action to an improper use. As counterdefendants point out, National alleges that "KMT sought the allocation well before the lawsuit was filed." Thus, National's claim of abuse of process must be DISMISSED.

### V

■ Finally, counterdefendants argue that National's claim that counterdefendants' "actions and course of conduct constitute tortious interference with [National's] business relations," fails to state a claim for tortious interference with prospective advantage. As counterdefendants point out, one who alleges a tortious interference with a prospective advantage requires a showing that the defendant's interference was illegal, unethical or fraudulent. *Weitting v. McFeeters,* 104 Mich. App. 188, 304 N.W.2d 525 (1981). *See also Meyering v. Russell,* 53 Mich.App. 695, 220 N.W.2d 121 (1974), *rev'd* 393 Mich. 770, 224 N.W.2d 280 (1974), *appeal after remand,* 85 Mich.App. 547, 272 N.W.2d 131 (1978).[19]

■ In this case it is apparent that National has not pleaded any illegal, unethical or fraudulent acts. Although National states that it has alleged *per se* unlawful antitrust conduct as well as other illegal activities in restraint of trade, National's antitrust allegations have been dismissed (unless they amend their complaint) for

failing to state a claim upon which relief can be granted. Moreover, National contends that Michigan law will allow a claim for tortious interference if the claim alleges "the intentional doing of a lawful act with malice and [sic] unjustified in law for the purpose of inunding plaintiff's contractual rights or business relationships." This is not Michigan law. The case National cites for this proposition, *Feldman v. Green,* 138 Mich.App. 360, 369, 360 N.W.2d 881 (1984) discussed the test for tortious interference with contractual relations with the test for tortious interference with a prospective advantage. The two tests are different and the section on which National relies relates to a contract claim. Thus, counterdefendants' motion must be GRANTED.

Therefore, for the reasons stated, counterdefendants' motions are GRANTED. National Amusements has ten days from the date hereof to amend its counterclaim in accordance herewith or else the counterclaim shall be dismissed.[20]

IT IS SO ORDERED.

---

19. *See also Feldman v. Green,* 138 Mich.App. 360, 378, 360 N.W.2d 881 (1984) ("without a specific allegation as to an unlawful purpose, we cannot say that the defendants overreached the bounds of interference permitted.")

20. Any amendment, the parties are reminded, should comply with Rule 11, Fed.R.Civ.P.