David A. DUNAFON, Plaintiff,

v.

**DELAWARE McDONALD'S CORPORATION, Defendant.**

**No. 87–4057–CV–C–5.**

United States District Court, W.D. Missouri, C.D.

May 9, 1988.

---

John Harl Campbell, David T. Holt, Campbell and Meyers, Kansas City, Mo.,

Norman W. Lampton, Columbia, Mo., for plaintiff.

Alan H. Silberman, Chicago, Ill., Larry M. Woods, Columbia, Mo., for defendant.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Plaintiff David A. Dunafon ("Dunafon") brought this action under Section 1 of the Sherman Act, 15 U.S.C. § 1. The plaintiff seeks injunctive relief pursuant to 15 U.S.C. § 26 to prohibit defendant Delaware McDonald's Corporation ("McDonald's") from enforcing the restrictive covenant set forth in the lease agreement executed in 1971 between McDonald's and the predecessors of Patrician Equities Corporation, owner and manager of the Biscayne Mall. This case was tried to the Court on February 1-2, 1988. The parties have submitted certain stipulated facts and exhibits, in addition to other trial exhibits. The Court has carefully considered all the evidence and the parties' post-trial briefs, and proposed findings of facts and conclusions of law.

■ Plaintiff's motion to strike the testimony of Dr. L. Kenneth Hubbell, defendant's economic expert, is overruled. Fed.R. Civ.P. 26(e) sets forth the circumstances under which a party is required to supplement or amend answers previously given in response to the other party's discovery request. Specific determinations are properly committed to the sound discretion of the trial judge. *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342, 344 (8th Cir.1979). Here, the substance of Dr. Hubbell's testimony was unchanged from his deposition to the trial. His testimony at both times was that there was no evidence that the restrictive covenant caused any anticompetitive effect. Moreover, there was no prejudice to plaintiffs from Dr. Hubbell's consideration of updated figures (which did *not* change his previous results) or Dr. Hubbell's impeachment of the methods used by plaintiff's expert, Dr. Michael F. Koehn. In fact, Dr. Koehn could have offered rebuttal testimony. The entirety of Dr. Hubbell's testimony is properly considered as admissible evidence by the Court.

## I. FINDINGS OF FACT

The following findings of fact were either stipulated to by the parties, or proven to the Court by a preponderance of the evidence.

A. *Parties and Jurisdiction*

1. Plaintiff David A. Dunafon, an individual residing in Columbia, Missouri, d/b/a Dunafon Enterprises, has been a Taco Bell franchisee since 1971.

2. Dunafon, d/b/a Dunafon Enterprises, owns two franchised Taco Bell restaurants in Columbia, located respectively on Business Loop 70 (established in 1976) and in the Food Court of the Columbia Regional Mall (established in 1986). Additionally, Dunafon Enterprises, Inc., a Missouri corporation whose joint shareholders are Dunafon and his wife, owns a third Taco Bell in Columbia at 411 South Providence Road. Dunafon is the licensed franchisee for all three of these Taco Bell restaurants. Dunafon also operates Taco Bell franchises in Kirksville, Missouri; in Fargo, North Dakota (two locations); Bismarck, North Dakota; and Aberdeen, South Dakota.

3. Defendant McDonald's, a Delaware corporation, is in the business of developing and franchising fast-service restaurants that offer breakfast, lunch, dinner and snacks.

4. A McDonald's restaurant (the "Biscayne Mall McDonald's") is located on a free-standing site in the parking lot of the Biscayne Mall on Stadium Boulevard, in the west part of Columbia.

5. Douglas Mehle ("Mehle"), through Mehle Enterprises, Inc. is the owner-operator of the Biscayne Mall McDonald's under a franchise agreement with McDonald's.

6. Patrician Enterprises Corporation ("Patrician Equities") owns and manages the Biscayne Mall.

7. The jurisdictional requirements of federal antitrust laws with respect to interstate commerce are not disputed. This Court has jurisdiction pursuant to 28 U.S.C.

**1236**

§ 1331, in that it arises under 15 U.S.C. § 1.

8. Patrician Equities was originally named as an additional defendant in this suit. However, Dunafon and Patrician Equities have entered into a settlement agreement. Pursuant to this agreement, Patrician Equities was dismissed without prejudice before the trial on February 1, 1988.

9. But for the restrictive covenant, or with the consent of McDonald's, Patrician Equities is willing to lease property in the Biscayne Mall to Dunafon for use as a Taco Bell, on certain terms as set forth in the settlement agreement.

B. *McDonald's Lease, Covenant and Franchise at the Biscayne Mall*

10. On February 1, 1971, Franchise Realty Interstate Corporation (then a subsidiary of McDonald's) entered into a lease with the Hanson Development Company ("Hanson") for the lease of property at the site of the Biscayne Mall McDonald's. McDonald's annual rent was set at $22,800, and adjusted on June 28, 1971, to total $23,001.48, based on certain construction costs. The lease was amended in 1975 to alter certain obligations of lessor and lessee with respect to maintenance of the premises.

11. Among other provisions, the lessor and lessee mutually agreed to the following covenant not to compete:

Lessor agrees that, during the term hereof, it shall not except with the written consent of lessee first had and obtained, directly or indirectly engage in, or grant a lease to any persons to engage in a carry-out fast food restaurant in which food and beverages are dispensed that is in direct competition with lessee within the mall shopping center. The foregoing restrictions and limitations shall, if lessor is a corporation, apply to all activities of officers, directors, subsidiaries and affiliates of lessor.

12. Franchise Realty's rights and obligations have accrued to McDonald's pursuant to a merger of McDonald's operations in 1980.

13. Patrician has succeeded to Hanson's rights and obligations under the lease.

14. McDonald's made improvements to the site in the amount of approximately $115,000, consisting mainly of the construction of the McDonald's restaurant building on the site. Once constructed, however, Mehle (as franchisee) was responsible for all costs relating to the operation, for capital improvements made later and for resulting profit and loss.

15. McDonald's franchise relationship with Mehle is reflected in a license and 20–year sublease of the Biscayne Mall McDonald's land and building. The lease and license are separate documents, both executed on October 14, 1971. Though other individuals have been involved, through a series of transactions, all interest in the lease and licensing agreement has been assigned to Douglas and Lynette Mehle.

16. Under the sublease of October 14, 1971, base rent was set at $32,100 per year, or 8½% of the monthly gross sales, whichever was greater. This monthly base rent payable by the franchisee is based on McDonald's total investment in the restaurant and the site.

17. When negotiating the purchase or lease of land for a McDonald's restaurant, McDonald's real estate representatives generally seek to obtain a covenant restricting the use of remaining nearby property of the seller or lessor as sites for other fast-service restaurants.

18. The restrictive covenant was negotiated as part of the entire lease agreement transaction, rather than as a separate agreement. Although there is no separately-stated consideration ascribed to the lease covenant in the lease for the Biscayne Mall McDonald's, the total consideration paid includes consideration for the covenant. This total consideration became the basis to calculate the minimum monthly rent payable to McDonald's by Mehle as a franchisee.

19. The Biscayne Mall McDonald's opened for business on February 1, 1972. At that time it had located ahead of the competition and was one of the only fast service restaurants on or near Stadium

Boulevard on the west side of Columbia. At this time, the Biscayne Mall was still partially under construction.

C. *Relevant Geographic and Product Markets*

20. Since 1972, there has been substantial commercial development in western Columbia. Shopping centers include the Cross Roads West Center, Forum Shopping Center and Columbia Regional Mall. Commercial development continues, especially north and west of the Columbia Regional Mall.

21. The Biscayne Mall McDonald's is located at the signaled corner of Worley and Stadium Boulevard, a few blocks south of Interstate 70.

22. Stadium Boulevard is a four-lane thoroughfare running generally north and south from Broadway to I–70.

23. Stadium Boulevard experiences substantial daily traffic. From 1972 to present, the traffic count has nearly doubled from approximately 15,000 to 29,000 cars per day.

24. Since 1977, many fast service restaurants have opened for business in the west part of Columbia. Disregarding the lease restriction at issue, there are no apparent barriers to entry into the fast-food service market in Columbia.

25. Although McDonald's was once primarily a hamburger-oriented restaurant, it now serves breakfast, lunch, dinner (including salads and chicken products) and snacks. Breakfast accounts for approximately 18–20% of the business at the Biscayne Mall McDonald's. Menu items are served either by drive-through facilities or by self-service for consumption at inside seating or for carry-out.

26. The following 40 food facilities are found in the general vicinty of the Biscayne Mall McDonald's:

 (a) On Stadium Boulevard, or on cross-streets within one block of Stadium Boulevard:
 (1) Wendy's
 (2) Sub Shop
 (3) Golden Corral
 (4) Furr's Cafeteria
 (5) Fina Gas Station Convenience Deli
 (6) Granddad's Custard
 (7) Pizza Hut
 (8) Kentucky Fried Chicken
 (9) Steak 'N Shake
 (10) K–Mart Food Counter
 (11) G & D Steak House
 (12) Hardee's
 (13) Burger King
 (14) Shell Station/Convenience Deli
 (b) In the Biscayne Mall building:
 (15) Wal–Mart Food Counter
 (16) Paradise D'Lites
 (17) Carousel Snack Bar
 (18) Hot Dog Stand
 (c) In Bernadette Square on Bernadette Drive:
 (19) T.J. Cinnamon
 (20) TCBY
 (d) In Crossroads West Shopping Center at Stadium Drive and Broadway:
 (21) Long John Silver's
 (22) G & D Steak & Pizza
 (23) Bonanza Steakhouse
 (24) House of Chow
 (25) Little Caesar's Pizza
 (e) In the Columbia Regional Mall
 (26) Target Store Cafeteria
 (27) Taco Bell
 (28) Arby's
 (29) Burger King
 (30) Sbarro's
 (31) All American Hero
 (32) Corn Dog
 (33) Bamboo House
 (34) Orange Julius
 (35) Cinnamon Corner
 (36) Majestic Gyros
 (37) Pork Tenderloin House
 (38) Grandma's Pantry
 (39) Seafood House
 (40) Oasis.

27. While some of the restaurants listed in ¶ 26 offer table service or have a method of delivering foods which differs from McDonald's, all of these restaurants offer food products that are substitutes to some of the products offered by McDonald's, and

thus are competitors in the relevant product market.

28. Sales at the Biscayne Mall McDonald's are primarily generated from those customers who visit the restaurant in conjunction with a visit to one or more retail or commercial locations in the trading area of the restaurant.

29. The Columbia Mall, Biscayne Mall and University of Missouri are major sources of business for the Biscayne Mall McDonald's.

30. The principal area from which the Biscayne Mall McDonald's draws its customers can be described as follows:

—Business Loop 70 on the North

—The western edge of the Columbia Mall on the west

—Stadium Boulevard on the south, but including also a corridor south along Providence Road that includes the University of Missouri campus

—College Avenue on the east.

31. Given the travel patterns for customers of the Biscayne Mall McDonald's shown in the record, most customers will pass by a substantial number of food service alternatives, including one or more of those listed in ¶ 26 above, when going to the area of the Biscayne Mall McDonald's, or to or from Columbia Mall, or one of the other business or commercial locations in the area. Thus, there is an opportunity for consumers to choose between and patronize a great number of fast-food facilities.

32. Approximately 35% of customers at plaintiff Dunafon's Taco Bell in the Columbia Mall Food Court report that they come "to eat." Approximately 46% more go "to shop" at the Mall. Dunafon does not advertise this Taco Bell other than through joint advertising efforts with the Mall.

33. Dunafon's written reports to Taco Bell list as competitor restaurants not only those located in the Columbia Mall Food Court, but also those fast-food restaurants up to one mile away. These include different types of food-service alternatives, including Red Lobster, Furr's Cafeteria, Long John Silver's, Steak 'N Shake, and Pizza Hut. Plaintiff has stated that Taco Bell required that these be listed. The Court concludes that this further evidences that numerous food facilities, as those listed in ¶ 26, offer substitutes which are reasonably interchangeable with food items and services offered by either McDonald's or Taco Bell.

34. The relevant geographic area within which consumers are able to turn for other food-service encompasses at least the area in which all the restaurants listed in ¶ 26 are located.

D. *Market Power*

35. Both plaintiff and Douglas Mehle have described conditions among fast-service restaurants in western Columbia as competitive. These restaurants generally offer competitive prices for their products.

36. The prices charged at the Biscayne Mall McDonald's have increased over the years but such increases are less than the rate of increase of published statistics for "food away from home" in a comparable area.

37. Mehle considers the prices of other area restaurants and fast food offerings, including those listed in ¶ 26, in establishing prices at the Biscayne Mall McDonald's. Although McDonald's has recommended price increases at certain times, Mehle has not increased prices until several months later. Sometimes Mehle has not increased prices or increased them at levels below McDonald's recommendation.

Of the 56 items on the menu at the Biscayne Mall McDonald's, 19 are priced below McDonald's recommendations. Approximately 60% of the sales come from items sold below McDonald's recommended prices.

38. There is uniformity of pricing at the Biscayne Mall McDonald's with other McDonald's operated by Mehle. This tends to show that the Biscayne Mall McDonald's does not enjoy a competitive advantage compared to other area McDonald's restaurants.

39. In addition to pricing, Mehle's operation of the Biscayne Mall McDonald's reflects competitive forces. In response to

anticipated competition from the Columbia Mall, Mehle remodeled and improved the restaurant. In response to a new Hardee's restaurant opening across the street in December, 1986, Mehle invested in a second drive-thru window, a wireless speaker system, new cash registers and an upgrade of the heating, air-conditioning and ventilation system. Since 1976, Mehle has invested over $680,000.00 in improvements. The Court concludes that these improvements have been made in response to competition even though McDonald's also makes recommendations to its franchisees for certain capital improvements.

■ 40. The Court rejects the testimony of plaintiff's expert, Douglas Sinclair, that the Biscayne Mall McDonald's market share is 19½%—24%. The 19-½% figure was based on a total volume of $10 million for 9 competitors and the Biscayne Mall McDonald's. The 24% share calculation was based on a total volume of $15 million which also included the food service providers in the Columbia Mall Food Court as competitors.

The Court, however, has concluded that the other food service facilities listed in ¶ 26 *also* are competitors in the relevant geographic area. Hence, plaintiff's market share figures are not credible evidence. Moreover, the sources used for estimating sales volumes of this incomplete list of competitors are lacking proper foundation and are unreliable.

41. The record does not contain evidence sufficient to establish that the Biscayne Mall McDonald's percentage of sales in the relevant geographic and product market is so high that it indicates market power.

42. During the time the Biscayne Mall McDonald's has been opened, many new restaurants have entered the market, particularly during the period 1985–87. Other restaurants, however, have exited. Wyatt's Cafeteria, located in the Biscayne Mall, opened approximately in 1972 and closed in 1975. A Taco Tico restaurant was located at the site now occupied by the Sub Shop. A Rocky Rococo Pizza restaurant, located on Worley just west of Stadium Boulevard, has closed. These facts are consistent with a competitive market and the notion that restaurants that fail to provide competitive products and services fail to achieve satisfactory sales levels.

43. Evidence offered by the plaintiff concerning the Biscayne Mall McDonald's profitability is not probative evidence establishing a rate of profitability inconsistent with competition. The testimony of plaintiff's expert, Dr. Michael F. Koehn, was not credible in this respect.

44. Dr. Koehn's entire regression analysis is rejected as incredible. The Court concludes that Dr. Koehn used inaccurate data and an inappropriate method in reaching his result-oriented conclusions.

■ 45. Evidence that the sales of the Biscayne Mall McDonald's have been higher than the average sales of other McDonald's restaurants in Columbia does not establish an anti-competitive condition. The trade area is substantially larger.

■ 46. Even though the Biscayne Mall McDonald's gross sales in 1986 were in the top 1% of all McDonald's in gross annual volume, this does not indicate market power in the relevant geographic and product market. Other restaurants and food service facilities have entered this market.

■ 47. Evidence offered by the plaintiff that he would expect sales of $750,000 at a proposed Biscayne Mall Taco Bell and would expect lower sales volumes at other locations is not evidence probative of a market-wide "output restriction" in the context of this case.

48. The plaintiff has not presented any evidence that tends to prove McDonald's power in the relevant market.

E. *Alternative sites in the relevant market*

49. Plaintiff Dunafon is free to purchase or lease other parcels of land at other locations in western Columbia, Missouri to open an additional Taco Bell location.

50. In 1985, Dunafon was unsuccessful in negotiating for freestanding sites in the

**1240**

Columbia Mall parking lot and on Worley Street east of Stadium Boulevard. The local Wendy's franchisee and Steak 'N Shake, respectively, obtained these properties.

51. In 1986–87, Dunafon failed in his attempts to purchase a Mobil gas station site at Stadium and Worley. This property is now leased to Hardee's for a fast-service restaurant.

52. Dunafon's personal judgment is that he does not want to consider sites other than ones that front on Stadium Boulevard. He has also rejected certain other sites on or near Stadium Boulevard as not satisfying his standards. He has rejected the possibility of locating a Taco Bell on the site of the present Burger King, Sub Shop, former Rocky Rococco, or on a pad at the Worley Street entrance to the Columbia Mall.

 53. Other opportunities exist for Dunafon to open an additional Taco Bell in western Columbia. Even though not all of the available sites satisfy criteria which would be applied by Dunafon, such criteria are not probative of the availability of locations for competition in the relevant geographic area.

 54. As regards the potential impact on competitive activity, it is insignificant whether a particular location is developed as a Taco Bell restaurant or as some other type of fast-service restaurant.

55. Dunafon's inability to open an additional fast-service restaurant at a site within the geographic market described in ¶s 30 and 34, above, is the result of his delay in taking action, his failure to meet competitive prices or related demands for acquisition of property (which were met by other competitors); and his imposition of standards and requirements which, while making good business sense to himself, constitute independent intervening factors.

F. *Pro-competitive benefits of the lease restriction*

56. The Biscayne Mall lease restriction was ancillary to McDonald's 1971 decision to enter this site and was ancillary to the

efforts of Patrician's predecessor to develop and lease the Biscayne Mall. Entry of new business in 1971–72 in the western part of Columbia, where little commercial or fast-service restaurant development previously existed, reflects business activity which is pro-competitive.

57. The restrictive covenant protects McDonald's investment in locating at a desirable site ahead of the competition. It affords such protection by preventing competitors from locating themselves right next to McDonald's and thereby using the fruits of McDonald's investment and earlier risk as a free-rider.

58. The lease restriction continues to have competitive value in that it constitutes an additional justification for pro-competitive business decisions by Mehle, as the operator of the Biscayne Mall McDonald's.

59. In a proposed Ground Lease Agreement that Dunafon signed on January 6, 1986, and submitted to Patrician Equities for approval, he included the following covenant:

26. NON–COMPETITION: Landlord agrees, during the term of this lease and any extension thereof and with respect to the Biscayne Mall Shopping Center to prohibit any use within the said Biscayne Mall Shopping Center of a Mexican food retail sales outlet.

60. After considering all the evidence, the Court concludes that the record does not establish any significant or substantial anti-competitive effect of the Biscayne Mall lease restriction.

## II. DISCUSSION AND CONCLUSIONS OF LAW

A. *Rule of Reason*

 Plaintiff has standing to sue under 15 U.S.C. § 26, which provides for injunctive relief against threatened loss or damage by a violation of the antitrust laws. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among

the several states, or with foreign nations, is declared to be illegal.... 

Congress did not intend to prohibit contracts that cause an insignificant restraint of trade. Only unreasonable restraints are forbidden. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

■ Thus, the Supreme Court has adopted the "rule of reason" analysis to evaluate most activity challenged under the Sherman Act. By contrast, the doctrine of *per se* illegality is applied only to certain conduct that is manifestly anticompetitive; those restraints "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Id.*

However, this is not an appropriate case to apply the *per se* rule. This Court agrees with the consensus of other federal courts that the varying terms, conditions and economic justifications for restrictive covenants in shopping center leases should more properly be examined under the rule of reason. *E.g. Harold Friedman, Inc. v. Thorofare Markets*, 587 F.2d 127, 141–42 (3rd Cir.1978); *Child World, Inc. v. South Towne Centre, Ltd.*, 634 F.Supp. 1121, 1129 (S.D.Ohio 1986); *Optivision, Inc. v. Syracuse Shopping Center Assoc.*, 472 F.Supp. 665, 675–76 (N.D.N.Y.1979); *Borman's, Inc. v. Great Scott Supermarkets, Inc.*, 433 F.Supp. 343, 348–50 (E.D.Mich. 1975); *Dalmo Sales Co. v. Tyson's Corner Regional Shopping Center*, 308 F.Supp. 988, 994 (D.D.C.1970), *aff'd*, 429 F.2d 206 (D.C.Cir.1970).

This approach is consistent with the rule that ancillary restraints should be evaluated under the rule of reason. *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 189 (7th Cir.1985). A restraint is ancillary if, when viewed at the time it was adopted, it may promote the success of a cooperative venture. *Id.*

■ Having determined that the lease restriction was an ancillary restraint, this Court has examined the record from a rule of reason perspective. See ¶ 56. Under this approach, plaintiff must first prove that McDonald's lease covenant had an "impact upon competition in the relevant market." *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1231 (8th Cir.1987). The lease restriction is not an unreasonable restraint of trade unless plaintiff shows that the Biscayne Mall McDonald's has obtained market power in a relevant market. *Id.* [1]

B. *Market Power*

Market power is the power to restrict output and thereby increase the selling price of a company's goods in the market. *Ryko*, 823 F.2d at 1232. Market power may be shown by a dominant percentage of sales in a well-defined relevant market and where there are significant barriers either to the entry of new firms or to increased output by existing firms. *Id.; Assam Drug Co., Inc. v. Miller Brewing Co., Inc.*, 798 F.2d 311 (8th Cir.1986). On the other hand, a lack of market power is demonstrated by direct evidence of competitive pressure (demonstrated by a significant number of viable competitors in the market) or by a product's price sensitivity. *Ryko*, 823 F.2d at 1232.

■ The market must be defined in terms of both product and geography. *Assam Drug Co.*, 798 F.2d at 318. "The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or ser-

---

**1.** Thus, the Court rejects plaintiff's argument that market power is not required to establish a § 1 violation here. Nothing in *NCAA v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), or *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) is to the contrary. In those cases, the Supreme Court held only that "the absence of proof of market power does not justify a naked restriction on price or output." *NCAA*, 468 U.S. at 109–10, 104 S.Ct. at 2964–65; *FTC*, 106 S.Ct. at 2018–19, as quoted in *Ryko Mfg.*, 823 F.2d at 1231, n. 14. The lease restriction is not a "naked" attempt to restrict output or raise prices.

vice." *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 500 (6th Cir.1983). This is the "reasonable interchangeability" standard. *Id.* Here, inexpensive food products usually served for breakfast, lunch, dinner and snacks are all reasonable substitutes for McDonald's menu items. Establishments serving such items include (among others) the food facilities in the Columbia Food Court.

The relevant geographic market may be evaluated as follows:

> [T]he area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for supplies.

*Id.* at 501 *quoting Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d 580 (1961). This is the area in which "producers effectively compete." *White & White*, 723 F.2d at 503.

■ The relevant geographic market is defined in ¶ 30 and 34 of the Findings of Fact. The forty food facilities listed in ¶ 26 are competitors in the relevant geographic and product market. It is clear from these facts that McDonald's does not possess the type of market power that would allow it to restrict output or raise prices in this relevant market.

First, plaintiff's exclusion from the Biscayne Mall does not prevent him from entering the market at another location in the geographic area. The plaintiff has either deliberately or inadvertently bypassed alternative sites. ¶s 49–55. Moreover, "Section 1 of the Sherman Act is concerned with *restraints* on competition, and the competition with which the Act is concerned is more than that contributed by the plaintiff. To amount to an unreasonable restraint of trade the anticompetitive conduct must have an effect greater than its effect upon plaintiff's business." *Gough v. Rossmoor Corp.*, 585 F.2d 381, 386 (9th Cir.1978).

■ Plaintiff must show how competitive conditions in the market as a whole have been substantially affected by the covenant. The fact that plaintiff cannot place a Taco Bell restaurant at his ideal selection site does not establish that there is a restriction of sites available to competitors generally and thus an exclusion from the relevant market. ¶ 47–48; *American Key Corp. v. Cole National Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985); *cf. Optivision*, 472 F.Supp. at 677, *Borman's*, 433 F.Supp. at 351. Obviously, there has been no barrier to the entry of new restaurants in the market. There are many viable competitors in the area. ¶ 26.

■ Nor has plaintiff demonstrated that the Biscayne Mall McDonald's market share is large enough to constitute market power.[2] The uncontroverted evidence of price sensitivity, as summarized in ¶s 35–38, also certainly supports the finding that the Biscayne Mall McDonald's lacks market power.

The plaintiff has failed to prove that the lease covenant has a substantial adverse effect on competition. Thus, it is unnecessary for the defendant to establish economic justifications for the restriction as an affirmative defense. *See N.C.A.A. v. Bd. of Regents*, 468 U.S. 85, 113, 104 S.Ct. 2948, 2966–67, 82 L.Ed.2d 70 (1984). Nonetheless, procompetitive economic justifications do exist for inclusion of the restrictive covenant in the lease. ¶s 18–19, 56–58. The covenant induced McDonald's to invest as a pioneer at this location in 1972, and protects the substantial continuing investment of Mehle and McDonald's from com-

---

**2.** As noted in ¶ 40, plaintiff's evidence does not support its claim that the Biscayne Mall McDonald's market share is 19–½ to 24%. However, even if this estimate was accurate, it does not constitute market power. *Assam Drug Co.*, 798 F.2d at 318, n. 18 *citing Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560, 1568–71 (11th Cir.1983) (70–75% market share constitutes market power); *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 483 F.Supp. 750 (D.Md.1980) (20–25% marketshare does not constitute market power); *aff'd* 638 F.2d 15 (4th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *O.S.C. Corp. v. Apple Computer, Inc.*, 601 F.Supp. 1274 (C.D.Cal.1985) (up to 20% market share does not constitute market power where substantial competition exists), *aff'd* 792 F.2d 1464 (9th Cir.1986).

petitors who seek a free-ride on McDonald's investment. ¶s 10, 14–19, 39. The lease restriction does not unreasonably restrain trade and does not violate § 1 of the Sherman Act, 15 U.S.C. § 1.[3]

Accordingly, it is hereby

ORDERED that judgment is entered in favor of the defendant Delaware McDonald's Corporation.

---

**3.** Similar non-competition covenants are common in shopping center leases. *See, e.g. Child World,* 634 F.Supp. at 1129. In fact, Dunafon proposed a similar covenant in the lease he submitted to Patrician Equities to lease space for a Taco Bell at the Biscayne Mall. ¶ 59.