**RECETAS POR MENOS, INC.,
et al., Plaintiffs**

v.

**FIVE DEVELOPMENT CORP.,
et al., Defendants.**

**Civil No. 02–1935(SEC).**

United States District Court,
D. Puerto Rico.

May 3, 2005.

---

Edward M. Borges, Borges Law Center, San Juan, PR, Jane A. Becker–Whitaker, Jane Becker Whitaker, San Juan, PR, for Plaintiff.

Guillermo A. Macari–Grillo, Macari Law Office, San Juan, PR, Jose A. Bague–Soto, Rivera Tulla & Ferrer, Hato Rey, PR, Enrique G. Figueroa–Llinas, Bobonis,

Guillermo J. Bobonis, Bobonis & Rodriguez Poventud, PR, for Defendants.

## AMENDED OPINION AND ORDER

CASELLAS, District Judge.

 Pending before the Court is Defendants' motion for summary judgment (Docket # 108). Plaintiffs opposed said motion (Docket # 115) and Defendants replied[1] (Docket # 136). After carefully reviewing the parties' filings and the applicable law, for the reasons set herein, Defendants' motion for summary judgment will be **GRANTED**.

### Procedural and Factual Background

Plaintiff Recetas Por Menos, Inc. ("RPM") filed the instant action against Defendants Five Development Corp. ("Five Development"); Farmacias El Amal, Inc. ("El Amal"); Rafael Pérez Diez,[2] administrator of Five Development;

---

1. Plaintiffs also moved to strike Defendants' reply for being in violation of Local Rule 7.1(c) and this Court's order of November 8, 2004 (Docket # 153). Defendants opposed Plaintiffs' request (Docket # 164). The Court will not strike Defendants' reply which is ten pages in length (Docket # 136). However, the Court will strike Defendants' supplemental reply which is forty-seven pages long (Docket # 136–Attachment # 1). Defendants also moved to strike several declarations under perjury and expert reports submitted by Plaintiffs (Dockets ## 137, 138 & 145). Because our ruling on these motions does not alter our disposition of the case, we will **DENY** Defendants' various motions to strike. However, this does not mean that these documents will automatically be given the weight that Plaintiffs intended. There are some defects in these documents that are worth noting. First, "[a]n expert's opinion that lacks any credible support does not create an issue of fact." *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir.1985)(*citing Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 n. 27 (D.C.Cir.1977)). Moreover, with respect to Mr. Mukamal's statement un-

der penalty of perjury, we note that "[c]onstruction of a relevant economic market or a showing of monopoly power in that market cannot, however, be based upon lay opinion testimony." *Id.* (*citing Forro Precision, Inc. v. Internat'l Bus. Machs. Corp.*, 673 F.2d 1045, 1059 (9th Cir.1982)). Therefore, to the extent that Mr. Mukamal's contentions are based on his lay opinion, they are insufficient to raise a genuine issue of material fact precluding the entry of summary judgment. Finally, Mr. Mukamal's second declaration, which is signed, is subscribed to as "Joseph J. Maximal." Furthermore, Appendixes I and II to Plaintiffs' expert's reply report (Docket # 153) are in Spanish. Therefore, the Court cannot consider them. Local Rule 10(b). In addition, the Court notes that, contrary to Plaintiffs' assertion, the expert's report was never amended to include her signature, or, at least, the Court has not been able to locate said alleged correction within Plaintiffs' submitted compiled exhibits.

2. Plaintiff also sues his wife and their conjugal partnership.

Saleh Yassin,[3] administrator of El Amal; and several unnamed defendants (collectively referred to as "Defendants") on June 18, 2002 seeking damages (trebled in accordance with the Antitrust Laws), interests, costs, and attorneys' fees, as well as specific performance and injunctive relief (Docket # 1). Plaintiff amended the complaint several times. The last version, the Third Amended Verified Complaint, was filed on March 26, 2004 (Docket # 79). In its last complaint, Plaintiff adds as Defendants PMC Marketing Corp. ("PMC") and YMAS Inventory Management ("YMAS").[4] Co-plaintiff Puerto Rico Pharmaceutical, Inc. ("PRPI"), Co-plaintiff RPM's supplier, also appears as plaintiff (collectively hereinafter "Plaintiffs").[5]

Per the Third Amended Verified Complaint, Plaintiffs claim violations to Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26, as well as violations to Puerto Rico's Anti–Monopoly Law, 10 L.P.R.A. §§ 257–276. Plaintiffs also request specific performance and damages under Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141 (Docket # 79).

Plaintiffs' claims arise out Five Development's nonrenewal of Plaintiffs' commercial lease at the Villa Fontana Shopping Center. Plaintiffs allege that Five Development did not renew the lease agreement because it entered into a contract with El Amal Group which requires that no other pharmacy be allowed to operate at the same shopping center (Docket # 79, ¶¶ 18, 35–36). Plaintiffs argue that El Amal Group "exercises monopolistic and/or oligopolistic power in the relevant market in which RPM and El Amal Group are located and compete" and that "El Amal Group and FIVE have colluded with the express purpose of putting RPM out of business and eliminating competition in the relevant market." (Docket # 79, ¶¶ 49–50). Furthermore, Plaintiffs allege that "El Amal Group's abuse of its monopolistic power constitutes an unreasonable attempt to monopolize" and that "[t]he efforts of El Amal Group and FIVE constitute a combination of entrepreneurs to harass and deter their competitors from having 'free and unlimited access' to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities of the group as ways of building up El Amal Group's empire and strangling competition by bringing baseless suits to evict plaintiff." (Docket # 79, ¶¶ 52 & 57).

Subsequent to filing its action, on June 18, 2002, Co-plaintiff RPM requested a preliminary injunction (Docket # 2). Co-plaintiff renewed its request on January 31, 2003 (Docket # 27). RPM requested that the Court stay a local injunction proceeding instituted against it by Five Development. RPM's preliminary injunctive request was denied on March 24, 2003. The Court found that Co-plaintiff RPM had failed to show irreparable harm (Docket # 34). Thereafter, on April 3, 2003, the Court of First Instance of the Commonwealth of Puerto Rico in Carolina rendered a judgment of eviction against RPM. As a result, Co-plaintiff RPM relocated and opened for business on June 15, 2004

---

**3.** Plaintiff also sues his wife and their conjugal partnership.

**4.** El Amal, however, does not appear listed as defendant in this last complaint. Instead, Plaintiffs refer to PMC and YMAS collectively as El Amal or El Amal Group because that is how the entity has been identified to the Puerto Rico Department of State (Docket # 79, ¶ 10). Per the information provided by Defendants, PMC owns a chain of pharmacies known as El Amal and Mr. Saleh Yassin is its Chief Executive Officer (Docket # 108 n. 4).

**5.** Joseph J. Mukamal is the sole shareholder of both RPM and PRPI (Docket # 79, ¶¶ 4–5).

(Docket # 91). The new location, Sánchez–Osorio Ave., 5–BB–9 Villa Fontana Park, is 482.28 meters from the Villa Fontana Shopping Center (Docket # 109, SUF # 21).

In reaching its judgment of eviction, the Court of First Instance expressly determined that: (1) the lease agreement between Five Development and RPM did not contain an automatic right to renew the lease; (2) Five Development, as the lessor, conserved its right to accept or reject RPM's offer to renew the lease and/or terminate the lease upon the expiration of the contract; (3) RPM did not have the unilateral right to renew the contract without the consent of Five Development; (4) Five Development did not breach its obligations under the lease agreement nor rejected Plaintiff's offers to renew the lease in bad faith; and (5) RPM continued to illegally occupy the premises notwithstanding the expiration of the lease. The Court then ordered the eviction of RPM from the premises and ordered RPM to pay Five Development three times the monthly rent payment for the period RPM illegally occupied the leased space in the Villa Fontana Shopping Center ($46,200.00, plus a per diem of $140.00 until it vacated the premises), attorneys' fees in the amount of $3,000.00, and an annual interest rate of 5.25% for obstinacy calculated from June 1, 2002 until RPM satisfied the judgment (Docket # 109, SUF # 35; Docket # 142, Exhibits # 12). RPM appealed and said appeal was dismissed for lack of jurisdiction (Docket # 171, Exhibit # 14). RPM then sought certiorari and the Court of Appeals denied RPM's request. (Docket # 171, Exhibit # 13).

## Standard of Review

Fed.R.Civ.P. 56(b) provides that: "A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part [of the claims asserted against him/her]." The Court may grant the movant's motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986); *NASCO, Inc. v. Pub. Storage, Inc.,* 29 F.3d 28 (1st Cir.1994). "The principal judicial inquiry required by Rule 56 is whether a genuine issue of material fact exists." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 3d* § 2725, p. 401.

In this regard, the First Circuit Court of Appeals has noted that for a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party. *U.S. v. One Parcel of Real Prop.,* 960 F.2d 200, 204 (1st Cir.1992); *see also Boston Athletic Assn. v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989); *Medina–Muñoz v. R.J. Reynolds Tobacco,* 896 F.2d 5, 8 (1st Cir.1990) ("[a] 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most favorable to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party.") (citations omitted).

By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Gov't Dev. Bank of P.R.,* 27 F.3d 746, 748 (1st Cir.1994). "A fact is material if it tends to resolve any of the issues that have been properly raised by the parties." Wright, Miller & Kane, *supra,* § 2725 at p. 419. "Not every genuine

factual conflict necessitates a trial. It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Martínez v. Colón,* 54 F.3d 980, 983–84 (1st Cir.1995).

In addition, when determining whether to grant summary judgment, the Court may not weigh the evidence. *Casas Office Machs., Inc. v. Mita Copystar Am., Inc.,* 42 F.3d 668 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id.* (*citing Greensburg v. P.R. Mar. Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machs.,* 42 F.3d at 684.

While the moving party has the burden of initially establishing that there is "an absence of evidence to support the non-moving party's case," *Maldonado–Denis v. Castillo–Rodríguez,* 23 F.3d 576, 581 (1st Cir.1994); the nonmovant has a "corresponding obligation to offer the court more than steamy rhetoric and bare conclusions." *Lawton v. State Mut. Life Assurance Co. of Am.,* 101 F.3d 218, 223 (1st Cir.1996). Furthermore, "the nonmovant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trialworthy issue.... Failure to do so allows the summary judgment engine to operate at full throttle." *Id.; see also Kelly v. United States,* 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); *Medi-*

*na–Muñoz,* 896 F.2d at 8, (*quoting Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

█ Local Rule 56(b),[6] moreover, requires the moving party to file annexed to the motion "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." Unless the non-moving party controverts this statement, all the material facts set forth therein "shall be deemed to be admitted." *Id.; Cosme–Rosado v. Serrano–Rodriguez,* 360 F.3d 42 (1st Cir.2004). This is the so-called "anti-ferret rule." *See, e.g., Orbi, S.A. v. Calvesbert & Brown,* 20 F.Supp.2d 289, 291 (D.P.R.1998). While failure to comply with this rule does not automatically warrant the granting of summary judgment, "it launches the nonmovant's case down the road toward an early dismissal." *Tavárez v. Champion Prods., Inc.,* 903 F.Supp. 268, 270 (D.P.R.1995).

█ Finally, antitrust cases are not shielded from summary judgment. *See e.g., In Re Mun. Bond Reporting Antitrust Litig.,* 672 F.2d 436, 440 (5th Cir. 1982). "[I]f the facts 'do not at least outline or adumbrate' a violation of the Sherman Act, the plaintiffs 'will get nowhere merely by dressing them up in the language of antitrust.'" *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984)(*quoting Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 654 (7th Cir.1984)).

### Applicable Law and Analysis

█ Defendants assert various grounds in support of their motion for summary

---

6. Formerly codified at Local Rule 311(12).

judgment. Namely, (1) that Plaintiffs cannot establish the essential elements of their claims; (2) that the relevant geographic market for the pharmacy business is far broader than the Villa Fontana Shopping Center given the availability of alternate sites for competition; (3) that Plaintiffs cannot prove harm to competition because the Puerto Rico Department of Health already found that competition is served since both El Amal and RPM are competing in the same market; (4) *res judicata*; (5) lack of monopoly power; and (6) failure to establish a conspiracy claim pursuant to antitrust law (Docket # 108).[7] Plaintiffs, on the other hand, have countered averring that material facts exist as to Defendants' violations of Sections 1 and 2 of the Sherman Act (Docket # 115). Because we find it to be dispositive of the case, we will only address Defendants' arguments with respect to the relevant geographic market.

 For purposes of this Opinion, we will assume *arguendo* that there is in fact an exclusive dealing agreement between Five and PMC.[8] As described by the First Circuit, an exclusive dealing contract is "[a] common arrangement that involves an agreement not to deal but is far from unlawful per se." *E. Food Servs., Inc. v, Pontifical Catholic Univ. Servs. Assoc., Inc.*, 357 F.3d 1, 4 (2004). Faced with such an agreement in this case, upon review, we find that the rule of reason governs our analysis. Plaintiffs have admitted as much. *See* Docket # 115 at p. 7. The alleged combination restraining trade in the instant case is vertical since the alleged agreement is between entities at different market levels. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Vertical restraints are not illegal *per se* unless they include some agreement as to pricing levels. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 735–36, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). No such condition has been alleged, nor is there any evidence submitted on that point. Finally, courts have consistently held that restrictive covenants in shopping center leases are not *per se* violations of the antitrust laws. *See*

7. Defendants also filed a motion to dismiss (Docket # 105), which Plaintiffs opposed (Docket # 114). Given the fact that the parties have already engaged in discovery and that Plaintiffs sought to convert the motion to dismiss to one for summary judgment, we only consider in this Opinion Defendants' motion for summary judgement. Furthermore, since we are granting said motion, Defendants' motion to dismiss (Docket # 105) and all related pending motions (Dockets ## 113 & 153A) are hereby deemed as **MOOT**. In addition, Plaintiffs' motion to compel discovery (Docket # 90), to change the discovery schedule (Docket # 91), and Plaintiffs' motion submitting sworn statement in support of both motions (Docket # 125), as well as Defendants' motion to strike the reply to its opposition (Docket # 100) and Defendants' motion to strike the motion submitting sworn statement (Docket # 128) and its opposition (Docket # 133) are also deemed as **MOOT**. We note that the discovery requested in Plain-

tiffs' motion to compel, to wit, financial data for El Amal, even if granted, would not affect our decision as set forth in this Opinion.

8. Defendants reject the existence of an exclusive dealing agreement. To that effect, they have submitted the lease agreement circumscribed by PMC (El Amal) and Five Development. (Docket # 109, Exhibit 11). Upon review, we find that there is no exclusivity clause regarding the operation of a single pharmacy at the Villa Fontana Shopping Center. Instead, the agreement precludes PMC from opening additional El Amal pharmacies within a one mile radius from the mall. Moreover, the agreement states that "all of the agreements made are written in this contract, that no other additional agreements exist, and that any changes should be realized in writing and signed by both parties." Nonetheless, we do not reach the ultimate conclusion proposed by Plaintiffs nor do we find that we need to.

*e.g., Harold Friedman, Inc. v. Thorofare Markets,* 587 F.2d 127 (3d Cir.1978); *Dunafon v. Del. McDonald's Corp.,* 691 F.Supp. 1232 (W.D.Mo.1988); *Child World, Inc. v. S. Towne Ctr., Ltd.,* 634 F.Supp. 1121 (S.D.Ohio 1986); *Optivision, Inc. v. Syracuse Shopping Ctr. Associates,* 472 F.Supp. 665 (N.D.N.Y.1979); *Borman's, Inc. v. Great Scott Super Markets, Inc.,* 433 F.Supp. 343, 348–50 (E.D.Mich. 1975); *Dalmo Sales Co. v. Tysonss Corner Reg'l Shopping Ctr.,* 308 F.Supp. 988, 994 (D.D.C.1970), *aff'd,* 429 F.2d 206 (D.C.Cir. 1970).

 Since the rule of reason governs our analysis, in order to establish an antitrust violation in the instant case Plaintiffs have to show that the alleged arrangement among Defendants has anti-competitive effects outweighing the legitimate economic advantages that it might provide. *E. Food Servs.,* 357 F.3d at 5 (*citing U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 595 (1st Cir.1993)). Typically, under the rule of reason, this requires that "the arrangement in question create or enhance market power—meaning the power to control prices or exclude competition" since "absent market power there is ordinarily no detriment and no reason to engage in any weighing." *Id.* (*citing* IIA Areeda & Hovenkamp, Antitrust Law, P 501 (2d ed.2002); *Oksanen v. Page Mem'l Hosp.,* 945 F.2d 696, 709 (4th Cir.1991)). Thus, it

stems from this discussion that the identification of market power be our first step. *See e.g., U.S. v. Visa, U.S.A., Inc.,* 344 F.3d 229, 238 (2d Cir.2003); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666 (7th Cir.1987).

 In order to assess market power, we must first identify the economic market in which said power can be measured. The plaintiff carries the burden of defining the relevant market. *Double D Spotting Serv., Inc. v. Supervalu, Inc.,* 136 F.3d 554 (8th Cir.1998). Moreover, the relevant market is divided into two components: the product market and the geographic market. *Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 345 (8th Cir.1995)("Antitrust claims often rise or fall on the definition of the relevant market."). *See* VII Areeda, Antitrust Law P 1503b, at 376 (1986)("virtually all courts applying the rule of reason require the plaintiff to define the product and geographic market in which competition is allegedly restrained"). The disagreement in the instant case is circumscribed to the geographic market.[9]

 "The geographic market is defined by considering the commercial realities faced by consumers. It includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as 'the market area in which the seller operates.'" *Dou-*

---

9. At this point, we have to address Plaintiffs' contention that it is for the jury to determine what area comprises the relevant geographic market in any particular case. Having reviewed the relevant precedents, we differ from Plaintiffs' understanding. For example, in *Double D Spotting Serv., Inc. v. Supervalu, Inc.,* 136 F.3d 554 (8th Cir.1998), the Eight Circuit affirmed the district court's grant of the defendants' motion to dismiss, finding that, *as a matter of law,* the plaintiffs' alleged geographic market was too narrow to support an antitrust claim. Noticeably, in said case, the plaintiffs averred that the relevant geo-

graphic market was the Supervalu warehouse in Urbandale, Iowa. The plaintiffs in *Double D Spotting Service, Inc.* challenged a contract between the owner of one particular warehouse within the Des Moines metropolitan area and one unloading service provider. The contract gave the unloading service provider all of the unloading services at that particular warehouse. The Eighth Circuit found that "the market for unloading services would seem to be more properly defined as including all warehouses within, at least, the entire Des Moines, Iowa, metropolitan area, if not an even larger area." *Id.* at 560–61.

*ble D. Spotting Serv., Inc.*, 136 F.3d at 560 (citations omitted)(*quoting Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580) ("The area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practically turn for supplies.").

 Plaintiffs contend that the relevant geographic market is the Villa Fontana Shopping Center because it is their understanding that, where pharmacies are concerned, parking is critical (Docket # 115, pp. 10–16). They have submitted their expert's (Heidie Calero) report to that effect as well their expert's reply to Defendants' expert's report[10] (Docket # 118, Exhibit 3; Docket # 153, Exhibit 4). The Calero report tracks the relationship between the number of prescriptions sold and the number of parking spaces at selected El Amal stores. The analysis yields a positive relationship of .69 (Docket # 118, Exhibit 3, p. 10). However, as pointed out by Defendants and their expert in his report, said analysis fails to consider other relevant variables, such as the flow of traffic in the particular shopping center (Docket # 136, Exhibit # 22). Although we concede that the availability of multiple parking spaces makes a location convenient, the lack thereof does not impede prescription drug clientele from seeking and reaching alternative locations.

The Fifth Circuit has recently considered and rejected the convenience argument. *Apani S.W., Inc. v. Coca–Cola Enters., Inc.*, 300 F.3d 620 (5th Cir.2002). In said case, the city had granted the defendant marketer exclusive rights to sell bottled water on facilities owned or operated by the city, which totaled twenty-seven

(27). The plaintiff, a manufacturer of purified bottled water, sued alleging illegal combination or conspiracy between the city and the defendant marketer. The plaintiff suggested that the twenty-seven city owned facilities were the relevant geographic market. He defended this definition with the premise that a patron attending an event at a City-owned facility would not likely cross the street to purchase a beverage at a convenience store where competing products may be displayed.

The plaintiff's geographic market definition was found to be legally insufficient as a matter of law. The Fifth Circuit held that:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient. . . .

*Id.* at 628. In reaching this conclusion, the Fifth Circuit pointed to the district court's finding that the plaintiff could do business in other locations and in fact had done so. The Fifth Circuit also upheld the district court's conclusion that the injury to competition was not sufficiently significant to rise to the level of an antitrust violation.

In a more extreme case, *Elliott v. United Center*, 126 F.3d 1003 (7th Cir.1997), a licensed peanut vendor who formerly sold peanuts outside the United Center, an entertainment complex, sued the United Center on the grounds that its policy of prohibiting patrons from bringing food into the complex violated the Sherman Act.

---

**10.** Ironically, Plaintiffs' expert also concluded that the Department of Health's criteria of a one mile radius was *too narrow* to analyze

real competition in the market (Docket # 153, Exhibit 4, pp. 199–200).

According to the vendor, the relevant geographic market was comprised by the "market for food concessions within and around the United Center itself." The district court dismissed the vendor's antitrust claim finding that the vendor failed to adequately identify a relevant geographic market. In affirming the district court's ruling, the Seventh Circuit stated that:

> The logic of Elliott's argument would mean that exclusive restaurants could no longer require customers to purchase their wines only at the establishment, because the restaurant would be 'monopolizing' the sale of wine within its interior. Movie theaters, which traditionally (and notoriously) earn a substantial portion of their revenue from the sales of candies, popcorn, and soda, would be required by the antitrust laws to allow patrons to bring their own food.

*Id.* at 1005.

The First Circuit has similarly rejected narrow market definitions as the one proposed in the instant case. In *Eastern Food Services, Inc.*, the First Circuit affirmed the district court's rejection of the plaintiff's proposed market as "extremely narrow" and not "large enough so as to constitute an economically significant area of commerce." 357 F.3d at 3. The plaintiff, who provided food services, sued the university and a vendor after the vendor and the university entered into an exclusive dealing arrangement for vending machines on campus. The First Circuit noted that "[f]rom the outset, Eastern's description of what happened raises warning flags for anyone familiar with antitrust law. The university, like most landlords, controls who may set up shop on its premises." *Id.* at 4. Nonetheless, the First Circuit continued and found that foreclosure in the campus segment of the market did not prevent the plaintiff from distributing its products at other outlets. Thus, the First Circuit highlighted, "except in special circumstances, a contract restricting a small percentage of a larger available market will have no anti-competitive effect on that market." *Id.* at 7.

Ignoring this precedent, Plaintiffs look to an unpublished opinion to support their arguments, namely, *Pay Less Drug Stores Northwest, Inc. v. City Products Corp.*, 1975 WL 906 (D.Or.1975). However, in said case, the district court did not make a determination as to the relevant geographic market. In invalidating the exclusivity clause, the district court nonetheless found that "[b]ecause of the physical characteristics of the area, the dynamics of the market and *the unavailability of alternate sites in the vicinity*, a site within the Oregon City shopping center is the only place from which the plaintiff can compete effectively in the market serviced by the center." *Id.* at *2 (emphasis added). This case is clearly distinguishable from the instant case, since RPM has already set up shop at a new location. As noted later by the Northern District of New York:

> It is significant that in the only case in which an exclusivity clause in a shopping center lease was invalidated *Pay Less Drug Stores Northwest, Inc. v. City Products Corp.*, supra the court found that alternate sites in the area were unavailable, and that a site within the shopping center in question was the only place from which the plaintiff could effectively compete in the market. This is not the case here.

*Optivision, Inc. v. Syracuse Shopping Ctr. Assocs.*, 472 F.Supp. 665, 677 (N.D.N.Y. 1979). After being denied renewal of the lease, RPM was able to open a pharmacy 482.28 meters from the Villa Fontana Shopping Center. In approving RPM's request to transfer its Certificate of Necessity and Convenience ("CNC"), the

Puerto Rico Department of Health recognized that there are five other pharmacies—Farmacia Amiga, Farmacia Walgreens, Farmacia Monserrate, Farmacia Puerto de Carolina, and super Farmacia Carolina—within a one mile radius from RPM's location.[11] (Docket # 142, Exhibit # 6). Although this location may not be as ideal as Plaintiffs' original spot at the Villa Fontana Shopping Center, this is not enough to establish antitrust injury. *See Double D Spotting Serv., Inc.,* 136 F.3d at 561 ("Disappointment at not receiving one unloading contract at one particular warehouse is insufficient as a matter of law to rise to the level of an antitrust violation within a relevant market.").

Plaintiffs also rely on *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127 (3d Cir.1978). Yet, in said case, there is no analysis of the relevant geographic market. Thus, it has no bearing on our discussion. Noticeably, as cited by Plaintiffs in their opposition to Defendants' instant motion, the Third Circuit recognized that "[a] final conclusion regarding the reasonableness of the restraint in this case must also await some evaluation of the relevant geographic market." *Id.* at 144.

Finally, Plaintiffs rely on *Morales–Villalobos v. García–Llorens,* 316 F.3d 51 (1st Cir.2003). However, they misinterpret the case, representing that the First Circuit recognized that, under appropriate circumstances, a relevant geographic market can be as small as the two hospitals in Arecibo. The plaintiff in said case was foreclosed from providing services in the entire town of Arecibo as a result of the exclusive dealing agreement since there were only two hospitals in the entire municipality.[12] The First Circuit reversed the district court's dismissal for failure to plead a relevant market finding that the matter could not be resolved on the face of the complaint. The First Circuit stressed the plaintiff's allegation that she was foreclosed from the outlets reasonably available to her and that, as an anesthesiologist, the primary outlets for her services ordinarily are hospitals and clinics. That is clearly not the situation here.[13] Plaintiffs have had an opportunity to conduct discovery as to the geographic market and have submitted their proof to that effect. Moreover, Plaintiffs have not been foreclosed from other outlets; they were able to open a new pharmacy at a different location within the same general area, although not in a shopping center.[14]

We are not treading uncharted waters. Numerous courts have addressed exclusivi-

**11.** The P.R. Department of Health's studies are limited to a one mile radius.

**12.** The First Circuit also pointed out that the plaintiff would not be able to provide her services at a neighboring municipality since the doctors she serviced did not have any privileges there.

**13.** Perhaps if Plaintiffs wanted to track the First Circuit's case and insist on the importance of parking spaces, they should have alleged a wider market, such as all the shopping centers in Carolina, if applicable.

**14.** Plaintiffs limited their search for new venues to a 500 meters radius in order to avoid having to obtain a new CNC (Docket # 118, SUF # 30). Per Defendants' statement of uncontested facts, there are nine (9) shopping strip malls in addition to other commercial leaseable space in the area between 65th Infantry Ave., Sánchez Osorio Ave. and Monserrate Ave. in Carolina, approximately one mile radius from the Villa Fontana Shopping Mall (Docket # 109, SUF # 5). Plaintiffs have countered asserting that of those nine (9) centers, two have El Amal pharmacies (Docket # 118,¶¶ 3–4). However, this does not mean that Plaintiffs are foreclosed from obtaining a location, as evidenced by the fact that Plaintiffs have moved to a new location which contains five (5) parking spaces (Docket # 118, Exhibit 3, p. 5).

ty clauses in shopping centers.[15] In addressing the specific issue of shopping centers, the Eleventh Circuit has asserted that "[a] precise definition of the geographic market is required, not space within regional shopping centers." *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 n. 7 (11th Cir.1985)(*citing Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580(1961)). Additionally, for example, in *Dunafon v. Delaware McDonald's Corporation*, 691 F.Supp. 1232 (W.D.Mo.1988), McDonald's had entered into an exclusive lease agreement with the owner of the mall. The plaintiff, restaurant owner, wanted to lease space in the mall and open a Taco Bell within the shopping center. The court found that the record did not establish that the restriction had any substantial anti-competitive effect. In addressing the specific issue of the relevant geographic market, the court concluded that it included the geographic area within which consumers were able to turn for other food-service and that this area included locations outside the mall in question. The court also found that the plaintiff was free to purchase or lease other parcels of land at other locations and that "[t]he fact that plaintiff cannot place a Taco Bell restaurant at his ideal selection site does not establish that there is a restriction of sites available to competitors generally and thus an exclusion from the relevant market." *Id.* at 1242.

In sum, the Villa Fontana Shopping Center does not contain an "appreciable segment of the product market." Earl W. Kintner, Federal Antitrust Law: Volume IV, Mergers & Markets § 38.2 (1984). The relevant market is the "area of effective competition" in which competitors generally are willing to compete for the consumer potential, and not the market area of a single company. *Am. Key Corp.*, 762 F.2d at 1581(*citing Tampa Elec. Co.*, 365 U.S. at 327–29, 81 S.Ct. 623). Counting only with one pharmacy, the Villa Fontana Shopping Center is not economically significant. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)("The geographic market selected must, therefore, both 'correspond to the commercial realities' of the industry and be economically significant."); *Apani Southwest, Inc.*, 300 F.3d at 627. Plaintiffs' suit is geared at gaining access to an ideal location. However, "antitrust claims are concerned not with wrongs directed against the private interest of an individual business but with conduct that stifles competition". *E. Food Servs.*, 357 F.3d at 4 (*citing Brown Shoe Co.*, 370 U.S. at 344, 82 S.Ct. 1502). "It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" *Bathke*, 64 F.3d at 344 (*quoting Brooke Group, Ltd. v. Brown & Williamson Tobacco*, 509 U.S. 209, 224, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)). Moreover,"harm does not mean a simple loss of business or even the demise of a

---

15. *See, e.g., Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183 (5th Cir.1985)(finding that the plaintiff had failed to show that the exclusive lease agreement with the anchor tenant adversely affected competition since it failed to show that competition from alternative mall sites was precluded); *Child World, Inc. v. S. Towne Ctr., Ltd.*, 634 F.Supp. 1121 (S.D.Ohio 1986)(upholding restrictive covenant in shopping center); *Optivision, Inc. v. Syracuse Shopping Ctr.*

Assocs., 472 F.Supp. 665 (N.D.N.Y. 1979)("The availability of such market alternatives is an important factor that supports a determination that the exclusivity clause here does not unreasonably restrain competition."); *Goodman v. Acme Markets, Inc.*, 1989 WL 42484 (E.D.Pa.1989)("A restrictive covenant which excludes the sale of grocery items within one-half mile of the Acme *does not* substantially affect the market for grocery items.").

competitor but an impairment of the competitive structure of the market." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,* 373 F.3d 57 (1st Cir.2004)(*citing Brown Shoe Co.* 370 U.S. at 344, 82 S.Ct. 1502).

Because we find that Plaintiffs have not met their burden of establishing a viable geographic market, we need not go further in our analysis. Nevertheless, we note El Amal's position of "anchor tenant" at the Villa Fontana Shopping Center [16] and that the relevant jurisprudence has recognized the importance of anchor tenants in regional shopping centers. *See Deauville Corp. v. Federated Dept. Stores, Inc.,* 756 F.2d 1183 (5th Cir.1985)("Successful regional shopping malls require 'anchor tenants.' "). Moreover, "antitrust laws do not compel a company to do business with anyone or to adjust the mix of mall tenants." *Am. Key Corp.,* 762 F.2d at 1578 (*citing United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)).

The inquiry into the relevant geographic market is essential to both Plaintiffs' Section 1 and Section 2 claims under the Sherman Act. *Double D Spotting Serv., Inc.,* 136 F.3d at 560. *See Stop & Shop Supermarket Co.* 373 F.3d at 66 (finding it "critical to any attack on the exclusive dealing arrangement—and almost any other non-per-se claim one could imagine—that plaintiffs establish a relevant market and harm within it"). Because we have found that Plaintiffs' proposed market is too narrow, we necessarily **GRANT** Defendants' motion for summary judgment on Plaintiffs' Sherman Act claims. Finally, because we are dismissing Plaintiffs' antitrust claims, Plaintiffs' request for injunctive relief is **MOOT.**

---

16. El Amal leases at Villa Fontana Shopping Center over five times the amount of space

### Supplemental Claims

Having dismissed all of Plaintiffs' federal claims, we will similarly dismiss Plaintiffs' Commonwealth law claims. *See Newman v. Burgin,* 930 F.2d 955, 963 (1st Cir.1991)("[t]he power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the law suit."). Accordingly, Plaintiffs' supplemental law claims are hereby **DISMISSED WITHOUT PREJUDICE.**

### Conclusion

For the reasons set herein, Defendants' motion for summary judgment is **GRANTED.** Thus, Plaintiffs' federal law claims are **DISMISSED WITH PREJUDICE,** and Plaintiffs' supplemental law claims are **DISMISSED WITHOUT PREJUDICE.** Judgment shall be entered accordingly.

**SO ORDERED.**

---

which RPM leased (Docket # 118, SUF # 37).